# IN THE SUPREME COURT OF IOWA

No. 19–1219

Submitted December 16, 2020—Filed May 14, 2021

**STATE OF IOWA,**

    Appellee,

vs.

**BRIAN De ARRIE McGEE,**

    Appellant.

---

Appeal from the Iowa District Court for Polk County, William Price (motion to suppress), Senior Judge, Becky Goettsch (trial) and Christopher Kemp (sentencing), District Associate Judges.

A defendant appeals his conviction for operating a motor vehicle while intoxicated, contending that the district court erred in denying his motion to suppress the results of a blood test. **REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, McDonald, and McDermott, JJ., joined. McDermott, J., filed a special concurrence in which Christensen, C.J., and Waterman, J., joined. Appel, J., filed a dissenting opinion. Oxley, J., filed a dissenting opinion in which Appel, J., joined.

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven (argued), Assistant Attorney General, John P. Sarcone, County Attorney, Maurice Curry and Kailyn Heston, Assistant County Attorneys, for appellee.

**MANSFIELD, Justice.**

"Affirm if you can, reverse if you must, but never remand." We receive this advice often from our colleagues on the trial bench. Here, however, the law changed after this case was heard in the district court. In June 2019, the United States Supreme Court decided that the Fourth Amendment "almost always" permits warrantless blood draws from unconscious drivers when the police have probable cause to believe the driver was operating while under the influence of alcohol. *Mitchell v. Wisconsin,* 588 U.S. ___, ___, 139 S. Ct. 2525, 2539 (2019) (plurality opinion). The Court allowed for an exception in the "unusual case" where the defendant can "show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id.* at ___, 139 S. Ct. at 2539. As we discuss herein, this significant development in the law necessitates a remand.

The defendant caused a two-vehicle accident by driving recklessly. The occupants of both vehicles were injured. The defendant was rendered unconscious, suffered a head injury, and was taken to the hospital smelling strongly of marijuana. A police officer was dispatched to the hospital to arrange for blood testing of the defendant. The defendant had been sedated for treatment and a medical professional certified pursuant to Iowa Code section 321J.7 (2018) that the defendant was unable to consent or refuse blood testing. Testing was performed, therefore, without the defendant's permission. It confirmed that the defendant had both THC and THC metabolites in his system. The defendant's motion to suppress this testing was overruled and the defendant was convicted of operating while intoxicated (OWI) in violation of Iowa Code section 321J.2.

On appeal, the defendant argues that this warrantless blood draw violated Iowa Code section 321J.7, the Fourth Amendment to the United States Constitution, and article I, section 8 of the Iowa Constitution. We find the State complied with section 321J.7. Regarding the Fourth Amendment, we hold that *Mitchell* applies to cases of suspected driving while under the influence of controlled substances, in addition to alcohol-related cases. However, because the parties did not have an opportunity to make a record under the *Mitchell* standard, we must utilize that dreaded remand. We also hold that article I, section 8 does not provide greater protection from warrantless blood draws than the *Mitchell* standard. Accordingly, we reverse the judgment below and remand for further proceedings in accordance with this opinion.

## I. Facts and Procedural Background.

On the afternoon of Saturday, December 8, 2018, at around 2 p.m., a call went out to Des Moines police to alert them of a vehicle collision on Euclid Avenue. Dispatch indicated there were numerous injuries and one person unconscious. Brian McGee was extracted from the driver's seat of one of the vehicles at the scene and taken to the hospital in critical condition, having suffered a head injury and having been rendered unconscious from the accident. Witnesses at the scene of the accident indicated to police that McGee had been traveling at a high rate of speed and failed to yield before making a left turn. This led to the collision with the other vehicle. Five occupants of the other vehicle were injured and had to be transported by medics to the hospital as well. It was determined when they reached the hospital that their injuries were not life-threatening.

Traffic was diverted away from the collision area. Both vehicles were towed away. It took until 4:30 p.m. to restore traffic. As police officers

and medics tended to McGee, they noticed a strong odor of marijuana coming from his person. An on-call Des Moines police officer—Tim Fricke—was summoned to report for duty and assigned the task of arranging for testing of McGee based on suspicions that he had been driving while impaired.

Upon arriving at the hospital, Officer Fricke was informed by medical staff that McGee had been sedated and would be unable to perform any initial screening tests for impairment or to provide a refusal or consent for blood testing. Also, Officer Fricke could see that McGee was unresponsive. Officer Fricke did not attempt to obtain a warrant. He later testified that he could have done so, but the Des Moines Police Department policy was to obtain a warrant for blood testing of a nonresponsive driver only if the offense would be a third or subsequent OWI or there was a serious injury or death.

Shortly before 4 p.m., Officer Fricke handed an official request for blood testing and a certification form to an advanced registered nurse practitioner who was present. The nurse completed and signed the certification that McGee was presently unable to give consent or refusal for testing. At this point, the medical staff initiated the steps necessary to draw blood from McGee. While this was going on, McGee suddenly awoke in a muddled state. McGee repeated the word "pee" frantically and began to urinate on himself as medical staff and his family attempted to help him sit up and urinate into a receptacle. During this time, McGee did not respond or even attempt to answer questions asked about his condition. He passed out again after being calmed by family and further attended to by medical staff. At around 4:10 p.m., McGee's blood was drawn. Results from the tests showed traces of lorazepam and delta-tetrahydrocannabinol

(THC) along with the presence of both the impairing and nonimpairing THC metabolites.[1]

On March 13, 2019, the State filed a trial information in the Polk County District Court charging McGee with OWI first offense. On April 11, McGee filed a motion to suppress the evidence obtained as a result of the warrantless blood draw, arguing the State needed "a warrant or exigent circumstances."

An evidentiary hearing took place on May 7 and 8 at which Officer Fricke testified and both his body cam video and the certification form were received in evidence. At the conclusion of the hearing, the district court denied McGee's motion to suppress. The district court ruled the State had complied with Iowa Code section 321J.7 in undertaking the warrantless blood draw and that neither the United States Constitution nor the Iowa Constitution required the State to obtain a warrant for the blood draw.

Thereafter the parties stipulated to a trial on the minutes. The district court found McGee guilty of first-offense OWI under the Iowa Code section 321J.2(1)(c) alternative ("any amount of a controlled substance is present in the person, as measured in the person's blood"). The district court expressly declined to find McGee guilty under section 321J.2(1)(a) (the "under the influence" alternative). McGee was sentenced to one year in jail with all but seven days suspended, fined $1250, and ordered to pay over $10,000 in restitution to various victims.

## II. Standard of Review.

McGee's motion to suppress raised both statutory and constitutional grounds. As to the statutory ground, our review is for

---

[1]The tests showed 15 ng/mL lorazepam, 17 ng/mL THC, 3 ng/mL hydroxy-THC, and 59 ng/mL carboxy-THC.

correction of errors at law and the district court's findings of fact are binding if supported by substantial evidence. *See State v. Smith*, 926 N.W.2d 760, 762 (Iowa 2019). With respect to the constitutional grounds, our review is de novo. *State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019).

### III. Legal Analysis.

Iowa Code section 321J.7 provides,

> A person who is dead, unconscious, or otherwise in a condition rendering the person incapable of consent or refusal is deemed not to have withdrawn the consent provided by section 321J.6, and the test may be given if a licensed physician, physician assistant, or advanced registered nurse practitioner certifies in advance of the test that the person is unconscious or otherwise in a condition rendering that person incapable of consent or refusal.[2]

In this case, an advanced registered nurse practitioner certified at 3:59 p.m. on December 8, 2018, that McGee was incapable of consent or refusal, having received intravenous injections of Ativan, Fentanyl, and Haldol. McGee maintains that the blood draw was unlawful and violated both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.

**A. Compliance with Iowa Code Section 321J.7.** Before getting to the constitutional questions, we will address McGee's claim that the blood

---

[2]Iowa Code section 321J.7 incorporates by reference the notion of implied consent set forth in section 321J.6. That latter section provides in part,

> A person who operates a motor vehicle in this state under circumstances which give reasonable grounds to believe that the person has been operating a motor vehicle in violation of section 321J.2 or 321J.2A is deemed to have given consent to the withdrawal of specimens of the person's blood, breath, or urine and to a chemical test or tests of the specimens for the purpose of determining the alcohol concentration or presence of a controlled substance or other drugs, subject to this section.

Iowa Code § 321J.6(1). "Iowa's implied consent law 'is based on the premise "that a driver impliedly agrees to submit to a test in return for the privilege of using the public highways." ' " *State v. Garcia*, 756 N.W.2d 216, 220 (Iowa 2008) (quoting *State v. Knous*, 313 N.W.2d 510, 512 (Iowa 1981)).

draw did not comply with the statute. When the nurse completed the certification at 3:59 p.m., McGee was sedated and appeared to be asleep. As preparations were being made for the blood draw around 4:04 p.m., McGee stirred. He made some irregular movements and indicated he had to "pee." With assistance he sat up at the front of the hospital bed. He urinated—initially on himself and on the floor of the hospital room and later into a urinal that was held for him. At approximately 4:06 p.m., McGee was helped to lie back down. He appeared to fall back asleep. The actual blood draw occurred four minutes later at 4:10 p.m.

McGee claims that a new certification should have been obtained in light of his waking up temporarily to urinate. The district court disagreed, finding that McGee's condition did not materially change during the eleven minutes between the certification and the actual blood draw. The court noted that McGee remained "totally unresponsive to the questions of the medical professionals [during the blood draw]." The recording on Officer Fricke's body cam shows the full sequence of events from 3:59 to 4:10 p.m. The district court's factual findings are supported by substantial evidence. *See State v. Axline,* 450 N.W.2d 857, 859–60 (Iowa 1990) (stating that "[c]onsiderable deference should be given to a trial court's factual findings" under Iowa Code § 321J.7, and that a person who is conscious can nevertheless be "in a condition rendering him incapable of giving or refusing consent").

As a matter of statutory interpretation, we agree that Iowa Code section 321J.7 does not usually require recertification when the blood draw occurs within eleven minutes of the initial certification. Certifications do not expire in eleven minutes, at least without clearer evidence that the driver has become capable of refusing or consenting in the meantime. Statutes come with a presumption of reasonableness, *see*

Iowa Code § 4.4(3), and this is a reasonable approach.  We hold that the blood draw complied with section 321J.7.

**B. Constitutionality of the Blood Draw Under the Fourth Amendment.**  We now turn to McGee's Fourth Amendment objection to the admission of the blood test results.  In a series of recent decisions, the United States Supreme Court has applied the Fourth Amendment to blood alcohol testing.  Its opinions, somewhat like the allegedly intoxicated driver whose rights they have sought to define, have twisted and turned somewhat.  They have not necessarily hewed to a straight path.

In *Missouri v. McNeely*, the Court rejected the proposition that the dissipation of alcohol in the blood justified a per se exigent-circumstances exception to the warrant requirement.  569 U.S. 141, 152, 156, 165, 133 S. Ct. 1552, 1561, 1563, 1568 (2013).  As the Court put it,

> In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, . . . it does not do so categorically.  Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances.

*Id.* at 156, 133 S. Ct. at 1563.

This then led to the question whether other exceptions to the warrant requirement might apply.  In *Birchfield v. North Dakota*, the Court held that the search-incident-to-arrest (SITA) exception to the warrant requirement authorized breath tests, but not blood tests, for alcohol.  579 U.S. ___, ___, 136 S. Ct. 2160, 2185 (2016).  The Court reasoned,

> Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test.  Respondents have offered no satisfactory justification for demanding the more intrusive alternative without a warrant.

*Id.* at \_\_\_, 136 S. Ct. at 2184. Addressing the situation where the driver might not be capable of performing a blood test, the Court commented,

> It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.

*Id.* at \_\_\_, 136 S. Ct. at 2184–85.

Lastly, in June 2019, one month after the suppression ruling in this case, the Court decided *Mitchell v. Wisconsin*, 588 U.S. \_\_\_, 139 S. Ct. 2525. *Mitchell* seemingly walked back (1) *McNeely*'s rejection of categorical exigent-circumstances exceptions and (2) *Birchfield*'s endorsement of warrant applications for blood tests of incapacitated persons. *Mitchell* presented the question of whether a warrant was needed for a blood draw from an unconscious driver. *Id.* at \_\_\_, 139 S. Ct. at 2529–30. The *Mitchell* plurality opinion concluded as follows:

> When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment. We do not rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Because Mitchell did not have a chance to attempt to make that showing, a remand for that purpose is necessary.

*Id.* at \_\_\_, 139 S. Ct. at 2539 (plurality opinion).

The *Mitchell* plurality reached back toward the reasoning in *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826 (1966), a case the

Supreme Court had decided over a half-century earlier. *See Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2537 ("*Schmerber* controls."). In *Schmerber*, the Court had upheld a warrantless blood draw from a *conscious*, suspected drunk driver. 384 U.S. at 772, 86 S. Ct. at 1836. It did so on the basis that blood alcohol "begins to diminish shortly after drinking stops" and "where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." *Id.* at 770–71, 86 S. Ct. at 1836.

Justice Thomas, concurring in the judgment, provided the necessary fifth vote in *Mitchell*. *See Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539 (Thomas, J., concurring in the judgment). He had dissented in *McNeely*. *See* 569 U.S. at 176, 133 S. Ct. at 1574 (Thomas, J., dissenting). Concurring in the result only in *Mitchell*, Justice Thomas reiterated his view that the natural metabolization of alcohol in the blood stream creates a per se exigency and a per se exception to the warrant requirement whenever law enforcement have probable cause to believe a driver is drunk. *See* 588 U.S. at ___, 139 S. Ct. at 2539.

"Under the narrowest grounds doctrine, the holding of a fragmented Supreme Court decision with no majority opinion 'may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 522 (Iowa 2011) (quoting *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977)). Hence, for Fourth Amendment purposes, the *Mitchell* plurality opinion controls.

The *Mitchell* plurality stated,

> [E]xigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application. Both conditions are met when a drunk-driving

suspect is unconscious, so *Schmerber* controls: With such suspects, too, a warrantless blood draw is lawful.

588 U.S. at ___, 139 S. Ct. at 2537. Thus, *Mitchell* stands for a rule that whenever probable cause exists to believe an unconscious driver has committed drunk driving, a warrantless blood draw would "almost always" be acceptable. *Id.* at ___, 139 S. Ct. at 2539. The only exception arises where law enforcement "could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id.* at ___, 1139 S. Ct. at 2539. Exigent circumstances, in other words, is defined generously, and is based on law-enforcement workload.[3]

If McGee had smelled of an alcoholic beverage rather than marijuana, there would be no doubt that *Mitchell* applies to this case. But those are not the facts. McGee's erratic driving, combined with the "strong odor" of burnt marijuana coming from him at the scene and at the hospital, gave the police probable cause to conclude that he had violated the *controlled substance* prongs of Iowa Code section 321J.2(1). *See* Iowa Code § 321J.2(1)(*a*) & (*c*); *State v. Watts*, 801 N.W.2d 845, 854 (Iowa 2011) ("[A] trained officer's detection of a sufficiently distinctive odor, by itself or when accompanied by other facts, may establish probable cause."); *State v. McMullen*, 940 N.W.2d 456, 461 (Iowa Ct. App. 2019) ("McMullen points to no authority requiring the officer to describe the odor with the specificity of a sommelier."). However, there was not enough here for a drunk driving probable cause determination. So the question we need to answer is whether *Mitchell* extends to controlled substances.

---

[3]As we discuss below, this *Mitchell* rule shares some characteristics with our 1966 holding under both the Fourth Amendment and article I, section 8 in a case involving an unconscious driver suspected of driving under the influence of alcohol. *See State v. Findlay*, 259 Iowa 733, 743, 145 N.W.2d 650, 656 (1966).

We think it does. At least one commentator has expressed this view:

> *Mitchell* could also provide justification for warrantless blood draws in cases where someone is suspected of driving under the influence of drugs, which also present a continuous risk that evidence is being destroyed through the suspect's metabolic processes. . . . *Mitchell* will likely play a role in future cases with drivers who are under the influence of drugs, which present similar, if not elevated, potential health, safety, and law enforcement needs.

*The Supreme Court, 2018 Term—Leading Cases*, 133 Harv. L. Rev. 302, 310 n.86 (2019).

Additionally, the South Carolina Supreme Court utilized the *Mitchell* plurality's standard in a case of controlled substances. *See State v. McCall*, 839 S.E.2d 91 (S.C. 2020). In *McCall*, the driver was involved in a very serious accident. *Id.* at 92. Officers "quickly believed that [the driver] was impaired by a substance other than alcohol." *Id.* at 95. The court found that exigent circumstances existed for a warrantless blood draw given the other duties of the officers and the likelihood that it would have taken ninety minutes to obtain a warrant. *Id.* at 95. The court added, "While alcohol has a relatively steady dissipation rate, other substances dissipate much faster." *Id.* In a footnote, the court adverted to expert testimony that the active ingredient in marijuana (THC) metabolizes more rapidly than alcohol. *Id.* at 95 n.2.

We have noted in our cases that "nonimpairing metabolites" of marijuana can remain in the body for some time and that any amount of these metabolites in blood or urine can constitute a violation of Iowa Code section 321J.2. *See State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017); *see also State v. Newton*, 929 N.W.2d 250, 256–59 (Iowa 2019). THC itself apparently dissipates much more quickly. *See* Andrea Roth, *The Uneasy Case for Marijuana as Chemical Impairment Under a Science-Based Jurisprudence of Dangerousness*, 103 Calif. L. Rev. 841, 885 (2015) ("THC

from smoked cannabis is 'detectable in plasma within seconds after the first puff,' with peak plasma concentration generally happening within three to ten minutes." (quoting Priyamvada Sharma et al., *Chemistry, Metabolism, and Toxicology of Cannabis: Clinical Implications*, 7 Iran J. Psychiatry 149, 151 (2012))). While THC can be found in the body "several hours or even days after consumption, depending on the frequency and amount of usage," *id.*, and "marijuana's unpredictable properties render nearly impossible any inference about the likely psychoactive effect on the brain of a specific THC blood level," *id.* at 887, the presence of THC in the blood makes the case for impairment stronger than it otherwise would be.

Law enforcement is not required to settle for the minimum in suspected OWI drug cases. Detection of the nonimpairing and long-lasting metabolite carboxy-THC is enough to establish OWI under Iowa law. *See Newton*, 929 N.W.2d at 256–59; *Childs*, 898 N.W.2d at 184. That's the bare minimum. But there are legitimate reasons why law enforcement would want more—namely, proof that fast-dissipating THC itself was in the driver's system. For one thing, evidence that the driver actually had the active ingredient and not merely an inert byproduct in their system might help avoid jury nullification in an era when criminalization of marijuana use has become increasingly controversial.

Also, if the driver unintentionally caused a serious injury to another person by operating a motor vehicle while intoxicated, that's a class "D" felony. *See* Iowa Code § 707.6A(4). In *State v. Adams*, a prosecution for the related crime of causing someone's death while intoxicated, we indicated that the State has the burden "to prove a causal connection between the defendant's intoxicated driving and the victim's death." 810 N.W.2d 365, 371 (Iowa 2012). So, if there is a potential for serious injuries, the State needs proof that the defendant was actually under the influence,

and not merely had vestiges of past marijuana use in their bloodstream. We recognize that a report had come back from the hospital that the five occupants of the other vehicle had not suffered serious injuries. Still, situations like this can be fluid. Here, one of the injured children needed thirteen stitches, missed two weeks of school, and was still scared of traveling in a car three and a half months later.

Additionally, from a victim restitution standpoint, it matters whether the defendant was under the influence of THC or just technically had a nonimpairing metabolite in their system. *See* Iowa Code § 910.1(6) (defining "pecuniary damages" for purposes of victim restitution as damages "which a victim could recover against the offender in a civil action arising out of the same facts or event"); *State v. Shears*, 920 N.W.2d 527, 539 (Iowa 2018) ("[M]any of our criminal restitution cases employ the causation test applicable in ordinary tort settings."). Notably, the restitution award here amounted to more than $10,000.

We have ourselves analogized the body's natural elimination of drugs to its natural elimination of alcohol, and upheld a warrantless stomach pump for drug evidence on that basis. *See State v. Strong*, 493 N.W.2d 834 (Iowa 1992). Thus, in *Strong*, we explained,

> [I]t is common knowledge that cocaine, once ingested orally, is absorbed into the blood and, like alcohol, is eliminated by the body. Therefore, the passage of time alone will operate to destroy the evidence. We conclude, under the rationale of *Schmerber*, that exigent circumstances existed here which justified a warrantless search.

*Id.* at 837. Notably, the rationale of *Schmerber*, which we relied upon in *Strong*, is essentially the rationale of *Mitchell*. *See Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2537.

For all these reasons, we conclude that the Fourth Amendment standards in *Mitchell* apply when law enforcement has probable cause to

believe that an incapacitated person committed OWI with respect to marijuana instead of alcohol.[4]  This then leads to the question whether we should apply those standards ourselves or remand for the district court to do so.  With verve and gusto, the State has gone through the minutes in its appellate briefing and detailed for us how it believes the *Mitchell* exigent-circumstances standard was met.  In the State's view, this was a very busy Saturday afternoon for the Des Moines police.

But no one had a real opportunity to make a record in the district court because the Supreme Court had not decided *Mitchell* yet.  Accordingly, we think the appropriate course under the Fourth Amendment is to reverse and remand with directions to conduct a suppression hearing under the *Mitchell* test: Is this a situation where Officer Fricke "could not have reasonably judged that a warrant application would interfere with other pressing needs or duties"?  *Id.* at ___, 139 S. Ct. at 2539.  Other state appellate courts have followed this course of action in light of *Mitchell*.  *See, e.g., McGraw v. State*, 289 So. 3d 836, 838–39 (Fla. 2019); *State v. Chavez-Majors*, 454 P.3d 600, 607–08

---

[4]One of the dissenting opinions argues that the State had to "present[] facts to the district court to support the compelling need to obtain evidence of active THC."  This would be inconsistent with *Mitchell*, where the plurality instead relied on *legislative* facts to establish a *general* rule upholding warrantless blood draws from incapacitated drivers suspected of drunk driving, subject only to an exception where the "police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties."  *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539.  As the plurality elaborated in a footnote,

> [W]e adopt a rule for an entire category of cases—those in which a motorist believed to have driven under the influence of alcohol is unconscious and thus cannot be given a breath test.  This rule is not based on what happened in petitioner's particular case but on the circumstances generally present in cases that fall within the scope of the rule.

*Id.* at ___ n.2, 139 S. Ct. at 2534 n.2.

(Kan. 2019); *State v. Key,* 848 S.E.2d 315, 349 (S.C. 2020).[5] Now we do so as well.

### C. Constitutionality of the Blood Draw Under Article I, Section 8.

We believe *State v. Findlay* provides the starting-point for article I, section 8 analysis of warrantless blood draws of allegedly intoxicated but incapacitated drivers. 259 Iowa 733, 145 N.W.2d 650 (1966).[6] In *Findlay,* the defendant was traveling down an Iowa highway northbound when his vehicle collided with another automobile traveling in the opposite direction. *Id.* at 735, 145 N.W.2d at 652. All occupants of both automobiles were injured. *Id.* At the scene of the accident, witnesses observed a semi-conscious defendant who smelled strongly of liquor. *Id.* Upon arriving at the hospital, the sheriff asked the attending doctor to obtain a blood sample from the defendant, who was now unconscious. *Id.* The physician refused, but did sign the certification form that the defendant was unconscious and not capable of consenting. *Id.* On the sheriff's order, a registered nurse took the blood sample. *Id.* It was sent

---

[5]McGee asserts that the State did not argue exigent circumstances below. That is correct but not surprising since *Mitchell* had yet not been decided. Instead, McGee argued there were *no* exigent circumstances. However, he did not utilize the definition which *Mitchell* later gave to that term, but a narrower meaning taken from *McNeely*, *Birchfield*, and *State v. Pettijohn*, 899 N.W.2d 1 (Iowa 2017). The State countered that the Iowa Code section 321J.7 procedure for incapacitated drivers was constitutional and its constitutionality had not been affected by *McNeely*, *Birchfield*, or *Pettijohn.* The fact that neither party had a chance to make a record on the *Mitchell* standard highlights, again, why a remand would be appropriate.

[6]The State discussed *Findlay* at some length in its briefing. McGee did not even cite *Findlay.* We caution parties that the vintage of an Iowa constitutional precedent is not, in itself, a reason to forgo discussion of that precedent. For example, in 2014 we treated *State v. Cullison*, 173 N.W.2d 533 (Iowa 1970), as the governing precedent in an article 8, section 1 case. *See State v. Short*, 851 N.W.2d 474, 506 (Iowa 2014) (discussing and relying on *Cullison*). We did so even though *Cullison* does not *mention* article I, section 8, and even though our court had not cited *Cullison* for any reason between 1970 and 2010.

for testing where results indicated the defendant was intoxicated. *Id.* at 735–36, 145 N.W.2d at 652.

Following his OWI conviction, the defendant appealed, raising the inadmissibility of the blood test. *Id.* We found the statute had been complied with. *Id.* at 737–38, 145 N.W.2d at 653. We observed that Iowa's implied-consent law for driving, which was then only three years old, "properly and clearly provides a workable rule governing 'searches and seizures,' which rule takes into account the 'practical demands of effective criminal investigation and law enforcement.' " *Id.* at 737, 145 N.W.2d at 653 (quoting *Ker v. California,* 374 U.S. 23, 34, 83 S. Ct. 1623, 1630 (1963)). We also concluded that neither the Fourth Amendment nor article I, section 8 had been violated, noting that blood tests "are recognized as commonplace in these days of periodic physical examinations, the quantity of blood needed for the test is minimal, and for most people the procedure involves virtually no risk, trauma or pain." *Id.* at 739, 145 N.W.2d at 654. We added,

> The public interest requires a holding that the disappearing evidence due to bodily assimilation created an emergency requiring prompt action. Under these conditions we find no unreasonable search and seizure and no substantial violation of defendant's constitutional right of due process.

*Id.* at 740, 145 N.W.2d at 655. Our analysis on this point rested heavily on *Schmerber.* *See id.* at 738–39, 741–42, 744, 145 N.W.2d at 654–57.

Thus, *Findlay* upheld a warrantless blood draw performed on an incapacitated driver against both state and federal constitutional challenges. At its core, *Findlay* largely forecasts the plurality opinion in *Mitchell.* We say "largely" because the exigent-circumstances discussions in the two opinions are not exactly the same. *Mitchell* adopts a rule that exigent circumstances are "almost always" present, with the only

exception being a light police workload.  *Findlay* likewise gives leeway to the State, but focuses on the potential loss of evidence.  Hence, *Findlay* indicates that when the officer "reasonably believed he was confronted with an emergency, a situation in which the delay necessary to obtain a warrant threatened 'the destruction of evidence,' he can rightfully order the blood withdrawal and complete the test."  *Id.* at 742, 145 N.W.2d at 656 (citation omitted) (quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S. Ct. 881, 883 (1964)).  Moreover, *Findlay* implies that when two hours and ten minutes have passed since the accident, exigent circumstances are per se present.  *See id.* at 743, 145 N.W.2d at 656.[7]

Despite the existence of the *Findlay* precedent, and its heuristic resemblance to *Mitchell*, each side in this case prefers that we not follow *Mitchell* under the Iowa Constitution.  McGee urges us to apply *State v. Pettijohn*, 899 N.W.2d 1 (Iowa 2017), to his case.  *Pettijohn* held that a warrant is ordinarily required under article I, section 8 before taking a breath test for blood alcohol from a suspected drunken boater.  *Id.* at 22–25.  We indicated that any exigent-circumstances exception to this warrant requirement under the Iowa Constitution should be available only rarely:

> [W]hen *unusual circumstances* arise that make an officer obtaining a warrant within two hours of witnessing the arrestee operating a boat impracticable, they may support the determination that exigent circumstances exist to justify the administration of a warrantless breath test.

*Id.* at 24 (emphasis added).  Although decided under the Iowa Constitution, *Pettijohn* borrowed from the discussions of exigent circumstances in *McNeely* and *Birchfield* and suggested that the scope of that exception

---

[7]Notably, the lapse of time between the accident and the blood draw at the hospital was two hours and ten minutes both in *Findlay* and in the present case.

would dwindle in OWI cases as electronic warrants became more widespread. *See id.* at 23–25.

Invoking *Pettijohn,* McGee argues that a warrant should be required for a blood draw from an allegedly intoxicated driver except in the infrequent situation when the State cannot feasibly get a warrant on time. We decline to adopt that position for two reasons. First, in *Pettijohn,* we expressly limited our decision to boating while intoxicated. *Id.* at 38. To make this clear, we devoted a separate section of the opinion and a separate heading to this point. *Id.*[8] Second, if we extended *Pettijohn* to driving, there would be no principled way to limit the extension to blood tests. *Pettijohn,* after all, involved a breath test. And we believe there would be significant practical costs in presumptively requiring warrants in OWI driving cases—without any corresponding gains in civil liberties.

Intoxicated driving often occurs when intoxication occurs, that is, at night and on weekends. And it is unfortunately rather prevalent. In 2019, the Iowa Department of Transportation reported 14,395 OWI revocations statewide. Iowa DOT, *Iowa OWI Revocations by Year and County 2001–2020* (2021), https://iowadot.gov/mvd/stats/owirevocations.pdf [https://perma.cc/69FP-4825]. So if warrants were presumptively required, we expect thousands of off-hours warrant applications every year. It is true that some drivers might consent, but the scales of the consent law could no longer be tipped with adverse consequences for not consenting. The typical driver suspected of OWI would therefore have

---

[8]A special concurrence articulated reasons why *Pettijohn* would not apply to driving. 899 N.W.2d at 40–41 (Cady, C.J., concurring specially). A dissent criticized these distinctions as unsound. *Id.* at 42–43 (Waterman, J., dissenting). Yet the dissent also stated, "Trial judges should accept the word of the majority and Chief Justice Cady's special concurrence that today's decision is limited to drunken boaters. The door is closed to any effort to extend this decision to drunken drivers." *Id.* at 42.

every incentive to buy time by not consenting, thereby forcing law enforcement to go through the hoops of obtaining a warrant.

And to what gain in civil liberties? Independent review by a judicial officer of the asserted grounds for searching a house, an apartment, a computer, or a cellphone *matters*. A wide variety of reasons for such searches exist, and there is no single formula that separates the proper from the improper search. Someone needs to sift through the asserted grounds for the search, make sure there is probable cause, and limit the search appropriately. With OWI, however, there are few if any judgment calls by the time a chemical test would be administered. Notably, in this case, McGee has not argued that probable cause for a blood draw was lacking. That is typical; only in the rare case does the defendant argue that implied consent was improperly invoked due to the lack of probable cause. More often, the defendant challenges the initial vehicle stop or alleges a violation of some statutory procedure. Here the police *could have* obtained a warrant and, according to Officer Fricke, would have done so if they had been investigating a more serious crime such as OWI third.

Moreover, with OWI, the relevant events giving rise to probable cause happen over a matter of minutes. Recording of those events is feasible, unlike with the events allegedly supporting probable cause for search of a home. Law enforcement has the incentive to record encounters with drivers suspected of OWI under the existing implied-consent regime, and those recordings provide more protection to defendants than a formalistic warrant requirement would.[9]

Once a warrant had issued based on law enforcement's representations about signs of intoxication, which we believe would

---

[9]*See Pettijohn*, 899 N.W.2d at 52 (Waterman, J., dissenting) (questioning the value of "assembly-line warrants" in OWI cases).

routinely occur, the defendant would have great difficulty challenging the test results. *See State v. Shanahan*, 712 N.W.2d 121, 132 (Iowa 2006) (noting that once a warrant issues "[w]e do not attempt to independently determine probable cause but rather 'merely decide whether the issuing judge had a substantial basis for concluding probable cause existed' " (quoting *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997))). By contrast, "[t]he State bears the burden of proving by a preponderance of the evidence that a warrant was not needed to authorize a warrantless search." *State v. Jackson*, 878 N.W.2d 422, 429 (Iowa 2016).

In sum, a presumptive warrant requirement for cases under Iowa Code section 321J.2, similar to the one we recognized in *Pettijohn* for section 462A.14 cases, would consume significant resources, both for the police and the courts. At the same time, we doubt it would add meaningfully to the existing protections for drivers derived from the implied-consent law.

Implied-consent laws have been present in all fifty states since the 1960s and they have not changed all that much during those six decades. Their universal adoption suggests that they work and that they aren't viewed as especially controversial. This may explain why the Supreme Court in *Mitchell* seemingly pulled back from its tone in *McNeely* and *Birchfield*, while gesturing as to the importance of blood alcohol testing. *See Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2535–38 (plurality opinion). The *Mitchell* plurality opinion is inelegant, it reads more like a debater's pamphlet than a tightly written legal analysis, and yet to us it generally makes sense.

At the same time that we are reluctant to tow *Pettijohn* onto dry land as McGee asks, we must also decline the State's invitation to hold Iowa Code section 321J.7 per se compliant with the Iowa Constitution. The

State wants us to recognize implied consent as a "free-standing exception" to the article I, section 8 warrant requirement. The Supreme Court has not taken this step in its Fourth Amendment jurisprudence. We agree with the State that, in theory, nothing prevents us from adopting a narrower interpretation of article I, section 8 than the Supreme Court's interpretation of the Fourth Amendment. Still, in this case, at this time, we are not inclined to do so.

Warrant exceptions need to be grounded in an underlying purpose or principle. One such principle is that warrantless searches are permissible when it would be impractical or unduly formalistic to obtain a warrant. This has led us to recognize warrant exceptions for exigent circumstances, searches incident to arrest, automobile searches, and consent. However, an exception needs to be based on something other than the legislation that created the exception. The problem with implied consent is that it is an artificial construct of Iowa Code chapter 321J. As the State acknowledges, implied consent "is not actual consent." *See also Mitchell*, 588 U.S. at \_\_\_, 139 S. Ct. at 2533 ("[O]ur decisions have not rested on the idea that these laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize.").

For now, therefore, we agree with the State's fallback position. Article I, section 8 does not demand a more rigorous standard than the *Mitchell* plurality imposed for warrantless blood draws on incapacitated drivers. *Mitchell* is a workable state constitutional standard. Accordingly, the Fourth Amendment remand we have ordered will resolve any issues under article I, section 8.

**D. Equal Protection Issues.** Finally, McGee argues that it violates both the Fourteenth Amendment and article I, section 6 equal protection

for unconscious drivers suspected of OWI to be treated differently from conscious drivers. We disagree. Since neither a suspect class nor a fundamental right is involved, we apply the rational basis test.[10] There are rational reasons for treating the two categories of motorists differently. Someone who is conscious can decide whether to consent or not to consent to testing. So it is logical to give them the choices delineated in Iowa Code sections 321J.6 and 321J.9. An unconscious driver by definition can't consent, and it would be unfair to allow such a driver to refuse. Unfair to the driver, who would suffer license revocation under section 321J.9; and unfair to the State, which would be unable to put the refusal into evidence because there had been no exercise of a choice. The Colorado Supreme

---

[10]McGee argues that there is a fundamental right involved because a blood draw implicates his article I, section 8 right to be free from unreasonable searches of his body. This approach is off the mark because it muddles the distinction between equal protection and other express constitutional guaranties. The fundamental rights analysis is most gainfully employed when a classification impinges upon the exercise of a fundamental right that lacks its own explicit constitutional guaranty—such as the right to marry or the right to travel. *See Obergefell v. Hodges*, 576 U.S. 644, 135 S. Ct. 2584 (2015); *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322 (1969). Where, however, a law has already been found not to violate an explicit constitutional guaranty, it usually does not add to the analysis to argue that the classification drawn by the law should be subject to strict scrutiny because it affects the fundamental right shielded by that same guaranty. Instead, at that point, the rational basis test is typically applied.

A good example of this approach is *Baker v. City of Iowa City*, 867 N.W.2d 44 (Iowa 2015). After determining that the Iowa City Civil Rights Ordinance did not infringe the Bakers' freedom of association, we then rejected their argument that their equal protection claim should reviewed under strict scrutiny. *Id.* at 57. As we put it,

> In their brief, the Bakers argue the ordinance infringes on their fundamental right to freedom of association under the First Amendment, and we should apply a strict scrutiny analysis. However, we have previously decided in this opinion the ordinance does not infringe on their fundamental right to freedom of association. Thus, we will not apply strict scrutiny. Therefore, rational basis review applies to the Bakers' federal equal protection claim.

*Id.*

In sum, the fundamental rights branch of equal protection analysis is usually not viewed as a way to expand the recognized substantive scope of other express constitutional guaranties. If it were, litigants would be raising it in just about every case involving alleged infringement of some other express constitutional provision.

Court recently explained these points well in rejecting a similar challenge to Colorado's OWI law:

> When drivers are unconscious, law enforcement officers are deprived of the evidence they typically rely on in drunk-driving prosecutions: unlike conscious drivers, unconscious drivers cannot perform roadside maneuvers, display speech or conduct indicative of alcohol impairment, or admit to alcohol consumption. In order to effectively combat drunk driving, the state needs some means of gathering evidence to deter and prosecute drunk drivers who wind up unconscious. Section 42–4–1301.1(8) satisfies that need. Therefore, Hyde's equal protection challenge, like his Fourth Amendment claim, fails.

*People v. Hyde*, 393 P.3d 962, 969 (Colo. 2017) (en banc); *see also People v. Kates*, 428 N.E.2d 852, 855 (N.Y. 1981) ("[D]enying the unconscious driver the right to refuse a blood test does not violate his right to equal protection."). Accordingly, we hold that section 321J.7 does not violate the Fourteenth Amendment or article I, section 6.

**IV. Conclusion.**

For the foregoing reasons, we reverse McGee's judgment and conviction and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

Christensen, C.J., and Waterman, McDonald, and McDermott, JJ., join this opinion. McDermott, J., files a special concurrence in which Christensen, C.J., and Waterman, J., join. Appel, J., files a dissenting opinion. Oxley, J., files a dissenting opinion in which Appel, J., joins.

**McDERMOTT, Justice (concurring specially).**

I join the majority opinion, but I write separately because I believe the Iowa Constitution's search and seizure protections in article I, section 8 do not mandate the procedures to establish "exigent circumstances" that the United States Supreme Court announced in its plurality opinion in *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525 (2019).

We generally interpret the search and seizure provisions in the Iowa Constitution to track with federal interpretations of the Fourth Amendment to the United States Constitution. *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019). Yet we nonetheless have a duty to interpret provisions of the Iowa Constitution independently, even when two constitutional provisions "contain nearly identical language and have the same general scope, import, and purpose." *State v. Brooks*, 888 N.W.2d 406, 410–11 (Iowa 2016) (quoting *State v. Jackson*, 878 N.W.2d 422, 442 (Iowa 2016)).

As the majority points out, the United States Supreme Court's recent decisions applying the Fourth Amendment to blood alcohol testing have wound a twisted path culminating most recently in *Mitchell*. The plurality opinion in *Mitchell* permits a warrantless draw of blood from an unconscious driver based on probable cause *except*—and here's the catch—where law enforcement "could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." 588 U.S. at ___, 139 S. Ct. at 2539. Stated differently, under the federal application of the probable cause requirement, in cases involving an unconscious driver suspected of alcohol intoxication, a blood draw from the driver is permissible without a warrant only if some other circumstance

"creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Id.* at ___, 139 S. Ct. at 2537.

Under the *Mitchell* plurality's holding, when the police come upon the scene of a crash and find an unconscious driver, whether probable cause exists to conduct a blood draw without a search warrant doesn't depend on circumstances inherent to the driver or the crash but on whether the police have some other more important task that takes priority over getting a warrant. Our constitution provides protection from "unreasonable" searches and seizures. But I find nothing in the Iowa Constitution's search and seizure protections that would require us to adopt the Supreme Court's difficult-to-administer rule from *Mitchell* to ensure "reasonableness." *State v. Tyler*, 830 N.W.2d 288, 294 (Iowa 2013) (referring to reasonableness as "[t]he touchstone of the Fourth Amendment" (alteration in original) (quoting *United States v. Knights*, 534 U.S. 112, 118, 122 S. Ct. 587, 591 (2001))); *see also Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 1856 (2011).

The "exigent circumstances" exception to the Fourth Amendment's warrant requirement applies when law enforcement's need to prevent the imminent destruction of evidence is so compelling that a warrantless search is "objectively reasonable" under constitutional search and seizure protections. *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011); *see also King*, 563 U.S. at 460, 131 S. Ct. at 1856. In a drunk-driving investigation, evidence erodes with each passing moment as alcohol dissipates naturally from the driver's bloodstream. *State v. Johnson*, 744 N.W.2d 340, 342–43 (Iowa 2008). The imminent destruction of evidence of suspected intoxicated driving implicates the exigent-circumstances doctrine. *Id.*; *see also Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 1834 (1966).

But instead of holding simply that exigent circumstances exist to conduct a blood draw of an unconscious driver suspected of alcohol intoxication *only if* law enforcement's to-do list contains some other pressing tasks (as the plurality in *Mitchell* held), I would adopt the reasoning of Justice Thomas's concurring opinion that exigent circumstances exist in these situations regardless of whatever other work police officers might have on their plates. *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539–40 (Thomas, J., concurring in judgment). Probative evidence of intoxication dissipates at the same rate regardless of whether a warrant application would interfere with an officer's other responsibilities. *Id.* at ___, 139 S. Ct. at 2540–41. The "other pressing needs or duties" inquiry has nothing to do with whether probable cause exists to support the unconscious driver's blood draw. If a blood draw is *per se* reasonable based on an officer's finding of probable cause of intoxicated driving when the police have other pressing duties, then there should be an equal quantity of probable cause supporting the blood draw when the police do not have other pressing duties.

Requiring a law enforcement officer dealing with an unconscious driver to ponder and measure the fuzzy question "Just how pressing are my other job responsibilities right now?" in deciding whether it's necessary to get a warrant will expose the officer to protracted second-guessing in later court proceedings. In the relatively short time since *Mitchell* came down, other jurisdictions have already started grappling with these questions. *See, e.g., McGraw v. State*, 289 So. 3d 836, 839 (Fla. 2019) (remanding for a determination of whether the search fell within the "other pressing needs or duties" exception); *State v. Chavez-Majors*, 454 P.3d 600, 608 (Kan. 2019) (same); *State v. Key*, 848 S.E.2d 315, 321 (S.C. 2020) (same). In some cases, the exercise required in *Mitchell* will allow evidence

essential to enforcement of intoxicated driving laws to erode while officers assess their other pressing needs or wait for a warrant to issue.

And to what end? The "other pressing needs or duties" inquiry comes with negligible upside for the protection of a suspect's civil liberties. When an officer attests to an unconscious driver's suspected intoxication, an overwhelming percentage of the time the court will find probable cause exists and issue a warrant for the blood draw. We should not, and need not, adopt as a matter of constitutional "reasonableness" the *Mitchell* plurality's complicated rule that secures virtually no protection against unreasonable searches and seizures yet constrains enforcement of intoxicated driving laws. As a matter of Iowa constitutional law, I would thus hold that law enforcement's investigation of an unconscious driver suspected of alcohol intoxication meets the exigency exception to the warrant requirement to permit a blood draw consistent with Iowa Code section 321J.11 without the need for a warrant.

The majority decides this case under the Fourth Amendment of the United States Constitution, and correctly so. When the Iowa Constitution provides less protection than the Federal Constitution, government officials must nonetheless comply with the more stringent provisions of the Federal Constitution. I thus join the majority opinion but urge our court to adopt, for purposes of Iowa's constitutional search and seizure protections, the straightforward per se rule described above in place of the *Mitchell* plurality's test.

Christensen, C.J., and Waterman, J., join this special concurrence.

**APPEL, Justice (dissenting).**

I respectfully dissent. The preserved issue in this case is whether Iowa's implied-consent statute provides a constitutional justification for a warrantless search of an unconscious driver suspected of drugged driving. Because of the lack of voluntary consent, the unconstitutional nature of the condition in the statute, and the similarity of the implied-consent statute to a general warrant, I think the answer to this question is firmly no under the search and seizure provision of article I, section 8 of the Iowa Constitution, and alternatively, under the Fourth Amendment to the United States Constitution.

The majority seeks a work-around to avoid the question regarding Iowa's implied-consent statute by answering a second question, namely, whether the warrantless search in this case could be justified under a modified version of the exigent-circumstances exception recently developed by the United States Supreme Court in the case of *Mitchell v. Wisconsin,* 588 U.S. \_\_\_, \_\_\_, 139 S. Ct. 2525, 2534–37 (2019).

There are two problems with the majority approach. First, the State did not pursue the fact-bound exigent-circumstances exception before the district court. As a result, the question is not preserved in this case. *State v. Baldon,* 829 N.W.2d 785, 789–90 (Iowa 2013).

In any event, I would not adopt the innovations to the traditional exigent-circumstances exception to the warrant requirement cobbled together by a narrow majority of the United States Supreme Court in *Mitchell* under the search and seizure provision of the Iowa Constitution. As in this case, the question of exigent circumstances in *Mitchell* was not raised below. Nonetheless, apparently to avoid the implied-consent issue similar to the one in this case, the *Mitchell* Court announced modification

of the exigent-circumstances exception for purposes of the Fourth Amendment in cases involving blood draws, without the benefit of briefs of the parties or amici on the issue. In my view, by adopting *Mitchell* on the unpreserved issue, the majority has uncritically adopted a flawed Federal Court decision when a better model is available, specifically, the approach of the Supreme Court only a few years earlier in *Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552 (2013).

Because the State loses on the merits of the only preserved claim, I would reverse and remand the case to the district court. In the alternative, if we were to consider the proposed reconstruction of the exigent-circumstances exception to the warrant requirement under a second bite of the apple theory, I would require on remand that the State prove what it has always been required to prove under the exigent-circumstances exception, namely, a compelling need and a showing that obtaining a warrant in a timely fashion was impracticable. In caselaw shorthand, I would follow the approach of the United States Supreme Court in *McNeely*, and not that developed in *Mitchell*.

The majority suggests that a *Mitchell*-type approach is especially necessary where drugged driving involving marijuana is involved. I view *Mitchell* as objectionable for a host of reasons as will be explained below. In my view, however, whether to adopt a new and specialized regime for blood draws seeking evidence of marijuana consumption should await a case where the record is fully developed both with respect to the toxicology involved and the ability of the state to obtain a warrant.

The specific issues posed in this case might be characterized as quite narrow, and, indeed they seem to be. But we have learned in search and seizure law that it is very important to keep exceptions to the warrant requirement narrow and disciplined. Or, to put it colloquially, in the law

of search and seizure, one thing leads to another.  I write with some energy to prevent erosion of search and seizure rights under article I, section 8 of the Iowa Constitution.

**I.  Background.**

**A.  Facts.**  This case involves a traffic accident that occurred on December 8, 2018, at 1:59 p.m. in Des Moines.  Brian McGee, a driver of one of the vehicles, was taken to the hospital in an unconscious state. About two hours after the accident, a Des Moines police officer, Tim Fricke, asked a nurse for a certification that the patient was "in a condition rendering [him] incapable of consent or refusal" under Iowa Code section 321J.7 (2018).  The nurse signed the certification and a blood draw was taken about ten minutes later.  Just prior to the blood draw, McGee aroused enough to urinate but then returned to bed.  The results of the blood draw showed traces of lorazepam and delta-tetrahydrocannabinol (THC) along with the presence of both the impairing and nonimpairing THC metabolites.

**B.  Motion to Suppress.**  McGee was charged with OWI, first offense, in violation of Iowa Code section 321J.2.  The trial information charged McGee with two alternatives under the statute: driving while under the influence and driving with any amount of a controlled substance in his bloodstream.

McGee filed a motion to suppress, and argued the search was conducted without a warrant and that under Iowa law, such a search is unconstitutional absent a "jealously and carefully drawn exception." McGee argued that the blood draw in his case was not a search incident to arrest, no exigent circumstances were present, and he did not consent to the chemical testing.

The district court held a hearing on the motion to suppress on May 7 and 8, 2019. At the hearing, McGee asserted that the warrantless blood draw was unconstitutional under the Fourth Amendment and article I, section 8 of the Iowa Constitution. McGee argued that the blood draw was a search, that the warrant requirement applied, and that the exigent circumstances and consent exceptions to the warrant requirement did not apply. McGee further argued that the blood draw was improper because he had gained consciousness after the nurse had signed the certification but prior to the blood draw. In addition, McGee asserted at the hearing that it would violate equal protection to require a warrant in a case involving a conscious driver but not in a case involving an unconscious driver.

The State responded to McGee's legal arguments by asserting that the blood draw pursuant to the implied-consent scheme of Iowa Code chapter 321J fell within the consent exception to the warrant requirement. The State did not claim that the blood draw could be supported by the exigent-circumstances or search-incident-to-arrest exceptions to the warrant requirement.

The district court opened the hearing as follows:

> [THE COURT:] The motion to suppress in general is based on the warrantless taking of Mr. McGee's blood in violation of the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Iowa Constitution. That would appear to put the burden on the State to go forward with the evidence. Are you in agreement with that, Mr. Curry, or not?
>
> MR. CURRY: Yes, your Honor.

Consistent with its stipulated burden, the State proceeded to offer evidence at the hearing. The State's first witness was Fricke, who was an eleven-year veteran of the traffic unit at the time of the accident. His

training included attendance at the Advanced Roadside Impaired Driving Enforcement program (ARIDE).

Fricke testified that he received a call regarding a serious injury accident and that he was to proceed to the hospital to obtain testing of a suspected impaired driver. Fricke testified regarding events at the hospital, including the sedated condition of McGee and his obtaining a certificate under Iowa Code section 321J.7 because the suspect was not able to consent due to his medical condition.

On cross-examination, Fricke was asked about his failure to obtain a warrant before the blood draw was taken. Below are all of the relevant transcript passages on the issue of failure to obtain a warrant:

> Q. Officer, was there anything preventing you from getting a warrant in this case? A. No. This is a -- for an OWI first that did not result in a fatality with this case, no.

> Q. So you concede that you could have obtained a warrant, correct? A. I don't believe that you can get a warrant for a first offense for an OWI.

> Q. Do you think that the procurement of a warrant depends on the number of offense on the OWI, that's your understanding? A. My understanding is that for an OWI first that does not result in a serious injury or a traffic fatality, that I would not be able to get a warrant for that.

> . . . .

> Q. You wouldn't dispute though the legal certainty that you can get a warrant based on probable cause, correct? A. No, I don't dispute that.

> Q. But you didn't get a warrant here? A. I did not.

> . . . .

> Q. Now, officer, one further point from the video, you would agree that blood was withdrawn at 1610, correct? A. That's correct.

> Q. And at that time you did not have a warrant, correct? A. I did not.

Q. You hadn't made any efforts to procure a warrant, is that correct? A. No.

Q. You didn't think you needed one? A. No.

. . . .

Q. As you began your OWI investigation, in that 30 to 40 minutes that it took you to get to the hospital, did you make any efforts during that time to secure a warrant? A. No.

Q. How about in terms of the officer that initially called you, did you instruct that officer to make efforts to secure a warrant? A. No.

. . . .

Q. Did you instruct that officer, the officer with whom you spoke with at the hospital, to make any efforts to get a warrant? A. No, I did not.

Q. And the officer that you spoke with at the hospital, is that the officer who would have followed Brian to the hospital, followed my client to the hospital? A. Yes.

Q. So I know I am kind of hammering it home. Safe to say no one involved in this OWI investigation made any efforts to procure a warrant, correct? A. Correct.

Fricke was also examined about the passage of twelve minutes between the signing of the certificate by medical personnel and the actual blood draw. The defense offered into evidence a video of officer Fricke's body camera that showed McGee arising from his bed and urinating during this time frame.

Aside from the testimony of Fricke and the admission of the certification, the State offered no further evidence. The defense rested without the introduction of evidence.

At the close of evidence, the district court heard oral arguments from the parties. The State argued that "implied consent is an exception to the warrant requirement." According to the State, the provision of Iowa Code section 321J.7 (providing a certification process where a driver is incapable of consent) is "the crux of the case before the court today." The

State argued that once a certification pursuant to Iowa Code section 321J.7 is obtained, "[t]here is nothing more needed." The State closed its argument by emphasizing that "[t]he scheme itself[, Iowa Code section 321J.7,] is [the] exception."

McGee argued that the implied-consent statute did not provide a basis for a warrantless blood draw. According to McGee, "the person who is asked to provide consent must be able to provide consent and when you have someone who is by definition incapable of providing consent, you cannot proceed under a consent-based exception." McGee further argued that if the implied-consent provisions of Iowa Code section 321J.7 were a stand-alone exception to the warrant requirement, a serious equal protection argument would be raised. According to McGee, conscious persons would be entitled to the protection of the warrant requirement, while unconscious persons would not. McGee also attacked the certification in the case in light of the twelve-minute gap and the video showing that McGee arose and urinated after the certification was executed.

At the conclusion of the hearing, the district court denied the motion from the bench. The district court found that 321J cases are an "exception to the warrant requirement." The district court further held that the State met its burden of showing that the statutory requirements of section 321J.7 were met and that there was no requirement of recertification because of the delay in obtaining the blood draw. The district court explicitly stated that the testimony of Fricke regarding whether he could get a warrant was "immaterial to this matter as none was required." The district court concluded that the State had met its burden of showing that the requirements of 321J were properly complied with by a preponderance of the evidence and, as a result, the motion to suppress was denied.

The district court did not discuss, and made no factual findings regarding, the possible application of the exigent-circumstances exception to the warrant requirement—a claim that the State did not make before the district court.

**C. Trial on the Minutes.** After the motion to suppress was denied, the parties agreed to a bench trial on the minutes of testimony. The district court convicted McGee under the alternative of the statute that prohibited driving with any trace of a controlled substance, *see* Iowa Code § 321J.2(1)(*c*). The district court concluded, however, that there was insufficient evidence to support a conviction on driving under the influence, *see id.* § 321J.2(1)(*a*).

**D. Issues Raised on Appeal.** McGee appealed his conviction. On appeal, McGee contends that a warrant to draw blood was required under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. He attacks head-on the district court's conclusion that the certification provisions of Iowa Code section 321J.7 provides an exception to the warrant requirement.

McGee asserts that any claim that the evidence was admissible under the exigent-circumstances exception was not relied upon by the State and was thus not preserved. In the alternative, however, McGee asserts that exigent circumstances were not demonstrated in this case. McGee again asserted that any approach that permitted a conscious person to insist on a warrant but denied the same right to an unconscious person would violate equal protection. Finally, McGee raises the statutory assertion that the terms of Iowa Code section 321J.7 were not complied

with because of the approximately twelve-minute delay between the certification and the blood draw.[11]

## II. Overview of Applicable Search and Seizure Principles.

**A. Introduction.** In considering any important legal issue, it is important to establish the legal context. By legal context I mean the larger environment of concepts and principles that touch upon and relate to the specific question at hand. If we immediately "cut to the chase," we may decide a case that is at odds with the larger legal environment. Further, our caselaw will become transactional, result-oriented, less coherent, and provoke unintended consequences. Only when the general legal principles governing search and seizure are canvassed and understood can we drill down and apply those general principles to the specific issue at hand.

Below is a summary of the legal principles that set the framework for the decision in this case. The concepts presented below have a relatively high degree of generality. I have made no attempt to compare or contrast the potentially different doctrines of search and seizure under the Iowa Constitution compared to the Fourth Amendment. We are free, of course, to depart from federal caselaw under the Fourth Amendment when interpreting the search and seizure provisions of the Iowa Constitution.

**B. Generally Applicable Constitutional Principles of Search and Seizure.**

1. *The purpose of search and seizure law is to protect individuals from overreaching government action.* As is apparent from the history of search and seizure law, the purpose of the constitutional protections is to prevent governmental overreach. Search and seizure law is designed to

---

[11]On appeal, McGee claimed that under the statute his prior certification was no longer valid after a twelve-minute delay and that the results of the blood draw should be suppressed on statutory grounds. On this point, I concur with the majority opinion rejecting McGee's claim.

draw boundaries around permissible government action. Constitutional protections against unlawful searches and seizures are not a minor inconvenience but play a crucial role in our constitutional governance by drawing lines that protect individuals from arbitrary government invasions of their privacy and dignity. As noted by Justice Jackson after his return from Nuremberg, search and seizure rights

> are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

*Brinegar v. United States*, 338 U.S. 160, 180, 69 S. Ct. 1302, 1313 (1949) (Jackson, J., dissenting).

It is true that search and seizure restrictions complicate the job of law enforcement. But as noted by one state court, "Duties of law enforcement officials are extremely demanding in a free society. But that is as it should be. A policeman's job is easy only in a police state." *People v. Spinelli*, 315 N.E.2d 792, 795 (N.Y. 1974).

Our Iowa constitutional history demonstrates the importance of bill of rights protections against government overreach. George Ells, Chair of the Committee on the Preamble and Bill of Rights, declared, "[T]he Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights." 1 *The Debates of the Constitutional Convention of the State of Iowa*, 103 (W. Blair Lord rep. 1857), http://www.statelibraryofiowa.org/services/collections/law-library/iaconst. Ells cautioned that "[t]he annals of the world . . . furnish many instances in which the freest and most enlightened governments that have ever existed upon earth, have been gradually undermined, and actually

destroyed, in consequence of the people's rights." *Id.* at 100–01. In order to protect the nascent state democracy, Ells stated the express desire

> to put upon record every guarantee that could be legitimately placed [in the constitution] in order that Iowa not only might be the first State in the Union, unquestionably as she is in many respects, but that she might also have the best and most clearly defined Bill of Rights.

*Id.* at 100. Of course, article I, section 8 of the Iowa Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Given the importance of the search and seizure provisions of the United States and Iowa Constitutions, they are not designed to be efficient. Without question, in all cases, they make the ability of the state law enforcement to engage in searches and seizures somewhat *less efficient.* But that is true with many precious rights. The right to a jury trial, with careful procedures to ensure representation of a fair cross section of the community in jury panels, is hardly efficient. So, the importance or value of a constitutional protection is not determined by efficiency considerations. Indeed, by placing the protections in the constitutional firmament, the founders desired to ensure that specifically enumerated constitutional rights remained firmly entrenched notwithstanding their inefficient characteristics. The scope of the bill of rights was not to be subject to periodic pragmatic adjustments by the legislature.

2. *The generally applicable bright-line search and seizure rule is "get a warrant."* Like its federal counterpart, article I, section 8 of the Iowa Constitution has a "reasonableness" clause and a "warrant clause." We have repeatedly stated that the reasonableness clause is informed by or

linked to the warrant clause. *See, e.g., State v. Ochoa,* 792 N.W.2d 260, 268–69 (Iowa 2010). In other words, subject to certain narrow exceptions, the general rule is that a warrant is required to conduct a search or seizure. *Id.* at 269.

The strong warrant preference approach was outlined decades ago by the United States Supreme Court in *Coolidge v. New Hampshire*:

> [T]he most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative."

403 U.S. 443, 454–55, 91 S. Ct. 2022, 2032 (1971) (omission in original) (footnotes omitted) (first quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967); then quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 1257 (1958); and then quoting *McDonald v. United States*, 335 U.S. 451, 456, 69 S. Ct. 191, 193 (1948)).

While the United States Supreme Court cases began to undercut the tradition of the warrant requirement in cases like *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164 (1987), *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587 (2001), and *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193 (2006), there seems to have been a resurgence in at least some Supreme Court cases. In a memorable recent phrase, Chief Justice John Roberts declared in a search and seizure context that the applicable approach, at least in the case at hand, was to "get a warrant." *Riley v. California*, 573 U.S. 373, 403, 134 S. Ct. 2473, 2495 (2014).

Our cases demonstrate that "get a warrant" is the general command of the search and seizure provisions of article I, section 8 of the Iowa Constitution, subject to certain exceptions. *E.g., State v. Coleman*, 890

N.W.2d 284, 286 (Iowa 2017). We have stated that Iowa courts "strongly favor the warrant requirement, subject only to 'jealously and carefully drawn exceptions.'" *Id.* (quoting *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992)); *see also State v. Gaskins*, 866 N.W.2d 1, 7 (Iowa 2015) (" 'A warrantless search is presumed unreasonable' unless an exception applies." (quoting *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997))); *Ochoa*, 792 N.W.2d 260, 285 ("We have also generally endorsed the warrant-preference requirement.").

3. *The generally applicable bright-line "get a warrant" rule is subject to narrow and well-defined exceptions that should be "jealously guarded" against even small incursions.* "[T]he basic rule [is] that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009) (quoting *Katz*, 389 U.S. at 357, 88 S. Ct. at 514). Although the general rule is get a warrant, we have recognized that there are certain exceptions to the warrant requirement. Two exceptions to the warrant requirement are consent and exigent circumstances.

These exceptions, however, must be tightly controlled lest they overcome the general rule that search warrants are required. The risk of encroachment was recognized by the Supreme Court in its first major search and seizure case, *Boyd v. United States*, 116 U.S. 616, 633–35, 6 S. Ct. 524, 534–35 (1886). In *Boyd*, the Court declared:

> [C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be

watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Id.* at 635, 6 S. Ct. at 535.

And, as stated by Justice Jackson in his classic discussion of search and seizure law, "any privilege of search and seizure without warrant" will be "push[ed] to the limit." *Brinegar*, 338 U.S. at 182, 69 S. Ct. at 1314 (Jackson, J., dissenting). As observed in *Almeida-Sanchez v. United States*: "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." 413 U.S. 266, 273, 93 S. Ct. 2535, 2540 (1973).

Any exceptions to the warrant requirement thus must be "jealously and carefully drawn" and subject to strict judicial oversight. *Jones*, 357 U.S. at 499, 78 S. Ct. at 1257. As noted by Justice Stevens, "The ascendancy of the warrant requirement in our system of justice must not be bullied aside by extravagant claims of necessity." *California v. Carney*, 471 U.S. 386, 401, 105 S. Ct. 2066, 2075 (1985) (Stevens, J., dissenting).

4. *The taking of a blood draw by the state is a search involving invasions of a person's most personal and deeply rooted expectations of privacy.* There is no serious doubt that the taking of a blood draw is a search. *See, e.g., Birchfield v. North Dakota*, 579 U.S. ___, ___, 136 S. Ct. 2160, 2173 (2016). It involves an invasion of "an individual's 'most personal and deep-rooted expectations of privacy.'" *McNeely*, 569 U.S. at 148, 133 S. Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 1616 (1985)). A blood draw places in the hands of the state a very large amount of private medical facts, for instance, whether a person "is epileptic, pregnant, or diabetic." *See Skinner v. Ry. Lab. Execs.*, 489

U.S. 602, 617, 109 S. Ct. 1402, 1413 (1989). Just as a cell phone is now a repository of huge amounts of personal information, the materials obtained in a blood draw can tell us many highly personal things about the individual. *See State v. Martines*, 331 P.3d 105, 111 (Wash. Ct. App. 2014) ("Testing of a blood sample can reveal not only evidence of intoxication, but also evidence of disease, pregnancy, and genetic family relationships or . . . [other] 'private medical facts.'" (quoting *Skinner*, 489 U.S. at 617, 109 S. Ct. at 1413)). Because of the invasive nature of the intrusion and the vast amount of private information that is subject to exposure, a blood test presumptively requires a search warrant based on probable cause. *See McNeely*, 569 U.S. at 148, 152, 133 S. Ct. at 1558, 1561.

5. *When applying the narrow and well-defined exceptions to the warrant requirement, per se rules are disfavored.* As a general proposition, exceptions to the warrant requirement are fact-based, not rule-based. The determination of whether a warrantless search meets a narrow and jealously guarded exception is not subject to "Procrustean application" of reasonability. *Ker v. California*, 374 U.S. 23, 33, 83 S. Ct. 1623, 1630 (1963). "[T]here is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *Id.* (quoting *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357, 51 S. Ct. 153, 158 (1931)). Thus, the Supreme Court has stated "that for the most part *per se* rules are inappropriate in the Fourth Amendment context." *United States v. Drayton*, 536 U.S. 194, 201, 122 S. Ct. 2105, 2111 (2002). As noted in *United States v. Banks*,

> [T]he facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out

to be important in a given instance, and without inflating marginal ones.

540 U.S. 31, 36, 124 S. Ct. 521, 525 (2003). This observation applies in the context of determining whether a warrantless search may be justified based on a narrow and jealously guarded exception.

6. *The burden is on the state to show the circumstances necessary to support the narrow exceptions to the "get a warrant" requirement.* In applying exceptions to the warrant requirement, the burden is on the state to show that an exception applies. *See Coolidge*, 403 U.S. at 454–55, 91 S. Ct. at 2032; *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S. Ct. 1969, 1972 (1970).

The rationale for placing the burden with the state is double-barreled. First, as a general matter, the party seeking an exception to a general rule carries the burden of proof. *See Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S. Ct. 2091, 2097 (1984) (stating that the government bears a "heavy burden" to show exigent circumstances). Second, the evidence that might support the fact-intensive features of the exception rests with the state. *Cf. United States v. N.Y., New Haven & Hartford R.R.*, 355 U.S. 253, 256 n.5, 78 S. Ct. 212, 214 n.5 (1957) ("The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary."). With these two well-established principles related to allocation of the burden of proof, it would be odd indeed to shift the burden of proof to a defendant to establish that the exception *does not apply.*

7. *A warrant is not required under the "jealously and carefully" applied concept of voluntary consent.* For many years, the Supreme Court had not discovered a consent doctrine to avoid the warrant requirement. However, in *Bumper v. North Carolina*, the Supreme Court stated, "When

a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." 391 U.S. 543, 548, 88 S. Ct. 1788, 1792 (1968). The Supreme Court elaborated on the consent doctrine in *Schneckloth v. Bustamonte*, noting that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. 218, 227, 93 S. Ct. 2041, 2047–48 (1973). Just as an unconscious person cannot consent to sexual relations, *Schneckloth* recognized that if "a person is unconscious or drugged or otherwise lacks capacity for conscious choice," there can be no voluntary consent. *Id.* at 224, 93 S. Ct. at 2046 (quoting Paul M. Bator & James Vorenberg, *Arrest, Detention, Interrogation and the Right to Counsel: Basic Problems and Possible Legislative Solutions*, 66 Colum. L. Rev. 62, 72 (1966)). And, if an individual is told he has no right to resist the search, the resulting search is not a result of voluntary consent. *See Bumper*, 391 U.S. at 548–49, 88 S. Ct. at 1791–92.

The consent doctrine has been characterized by the Supreme Court as "jealously and carefully drawn." *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S. Ct. 1515, 1520 (2006) (quoting *Jones*, 357 U.S. at 499, 78 S. Ct. at 1257); *see also State v. Lowe*, 812 N.W.2d 554, 572 (Iowa 2012) ("The State has the burden to prove the consent was voluntary, and voluntariness is a 'question of fact to be determined from the totality of all the circumstances.' 'The State is required to establish the consent was voluntary by a preponderance of the evidence.' " (citations omitted) (first quoting *State v. Lane*, 726 N.W.2d 371, 378 (Iowa 2007); and then quoting *State v. Reinier*, 628 N.W.2d 460, 465 (Iowa 2001) (en banc))). Plainly, consent is not created by law—it arises from facts.

Once given, however, consent to search may be withdrawn. *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 1804 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *see also* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 8.2(f), at 124 (6th ed. 2020) ("A consent to search is not irrevocable, and thus if a person effectively revokes his prior consent prior to the time the search is completed, then the police may not thereafter search in reliance upon the earlier consent." (footnote omitted)). The right to revoke consent to search is consistent with other areas of the law where consent may be revoked. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 469–79, 8 S. Ct. 1602, 1625–30 (1966) (describing that there is a right to revoke waiver of the right to counsel). The state has the burden of proving that consent had been "freely and voluntarily given." *Bumper*, 391 U.S. at 548–50, 88 S. Ct. at 1792.

A number of state courts have rejected the *Schneckcloth* "totality of the circumstances" test in favor of the more stringent standard of knowing and voluntary waiver announced in *Johnson v. Zerbst*, 304 U.S. 458, 464–69, 58 S. Ct. 1019, 1023–25 (1938). In *State v. Pals*, we found it unnecessary to address the question of a more stringent standard under article I, section 8 of the Iowa Constitution. 805 N.W.2d 767, 782 (Iowa 2011). Both tests, however, are fact-based and must be determined in each individual case.

8. *Exigent circumstances have been recognized as a narrow and jealously guarded exception to the warrant requirement where the state makes a factual showing of compelling need and obtaining a warrant is impracticable.* The exigent-circumstances exception applies where " 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the

Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 1856 (2011) (alteration in original) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 2414 (1978)). In order to invoke the exigent-circumstances exception, the state must show a "compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949 (1978).

The exigent-circumstances exception has been applied where police need to provide help to a "seriously injured" occupant of a house or there is an imminent threat of such injury to that person, *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006), when officers are in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42–43, 96 S. Ct. 2406, 2409–10 (1976), and to enter a burning building to put out a fire, *Tyler*, 436 U.S. at 509, 98 S. Ct. at 1950. The threat of destruction of evidence may give rise to exigent circumstances. *See Santana*, 547 U.S. at 43, 96 S. Ct. at 2410.

Like other exceptions to the warrant requirement, the state bears the burden of proof on the exigent-circumstances exception. *See, e.g., Welsh*, 466 U.S. at 749–50, 104 S. Ct. at 2097. The warrant requirement cannot be excused absent a showing that "the exigencies of the situation made [the search] imperative." *McDonald*, 335 U.S. at 456, 69 S. Ct. at 193.

9. *Administrative convenience can never by itself justify disregard of search and seizure principles.* In *Johnson v. United States*, the Supreme Court observed that "the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate[] . . . are never very convincing reasons and, in these circumstances, certainly are not enough to bypass the constitutional requirement [of a warrant]." 333 U.S. 10, 15, 68 S. Ct. 367, 369 (1948).

A few years later, the Supreme Court stated that the warrant requirement was not "an inconvenience to be somehow 'weighed' against the claims of police efficiency." *Coolidge*, 403 U.S. at 481, 91 S. Ct. at 2046. And, in *Mincey v. Arizona*, the Supreme Court again emphasized that "the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." 437 U.S. at 393, 98 S. Ct. at 2414. Obviously, "the investigation of crime would always be simplified if warrants were unnecessary." *Id.* But, "the Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S. Ct. 1208, 1216 (1972).

10. *The Iowa Supreme Court "zealously" protects authority to engage in independent search and seizure analysis.* It is well established that a state supreme court has the ultimate authority to determine the meaning of state constitutional provisions and that there is no obligation to simply follow federal precedent even where the federal and state constitutional provisions are nearly identical. We have departed from federal search and seizure precedents on a number of occasions. *See, e.g., State v. Ingram*, 914 N.W.2d 794, 799–801, 820–21 (Iowa 2018); *State v. Short*, 851 N.W.2d 474, 492, 506 (Iowa 2014); *Baldon*, 829 N.W.2d at 790–91, 802–03; *Ochoa*, 792 N.W.2d at 267; *State v. Cline*, 617 N.W.2d 277, 285 (Iowa 2000). We have stated that we zealously reserve the right to engage in independent analysis. *See, e.g., Ochoa*, 792 N.W.2d at 267; *Zaber v. City of Dubuque*, 789 N.W.2d 634, 654–55 (Iowa 2010); *State v. Hoskins*, 711 N.W.2d 720, 725 (Iowa 2006). This court has canvassed in detail the rationale for independent state constitutional analysis and that need not be reprised in detail here. *See, e.g., Short*, 851 N.W.2d at 481–92; *Baldon*, 829 N.W.2d at 789–91; *Ochoa*, 792 N.W.2d at 264–68.

**C. Statutory Provisions of Iowa Code Chapter 321J.** Iowa Code chapter 321J, entitled "Operating While Intoxicated," has various statutory provisions relating directly to the authority of police officers to obtain warrantless blood draws of nonconsenting persons. The provisions relate to implied consent, the testing of dead or unconscious persons, the consequences of refusal to submit to testing, written or telephonic search warrants, and obtaining samples without a warrant. *See* Iowa Code §§ 321J.6, .7, .9, .10, .10A.

Three provisions are particularly germane to this case. Iowa Code section 321J.6 provides that "a person who operates a motor vehicle in this state . . . is deemed to have given consent to the withdrawal of specimens of the person's blood . . . for the purpose of determining the alcohol concentration or presence of a controlled substance or other drugs."

Iowa Code section 321J.7 provides that "a person who is dead, unconscious, or otherwise in a condition rendering the person incapable of consent or refusal is deemed not to have withdrawn the consent provided by section 321J.6."

Iowa Code section 321J.10 provides for, among other things, telephonic warrants where "[a] traffic accident has resulted in a death or personal injury reasonably likely to cause death."

Iowa Code section 321J.10A states that a police officer may obtain a sample without a warrant if the person is under arrest for operating a vehicle unlawfully and the police "officer reasonably believes the blood drawn will produce evidence of intoxication," the method used is reasonable and "performed in a reasonable manner," and the officer "reasonably believes the officer is confronted with an emergency situation

in which the delay necessary to obtain a warrant . . . threatens the destruction of the evidence."

**III. Overview of Applicability of the Warrant Requirement for Bodily Intrusions of Unconscious Suspects.**

**A. Introduction.** Having examined the generally applicable search and seizure principles and relevant statutory provisions, I now consider whether the state may engage in warrantless blood draws of unconscious persons either based on "implied consent" (i.e., implied by law under Iowa's implied-consent statute) or based on exigent circumstances that make application for a warrant impracticable.

Before diving into the caselaw, it is important to distinguish between two distinctly different consent issues under implied-consent laws. The first question is whether actual consent given by a suspect pursuant to an implied-consent statute is "voluntary" under search and seizure law. That was a key issue in *State v. Pettijohn*, 899 N.W.2d 1, 25–38 (Iowa 2017), and has proven controversial. There is authority in the cases that tends to indicate that the state may place some level of pressure on a suspect to obtain consent for a blood draw, but there is a question of where to draw the line. Some courts, including recently the United States Supreme Court, have determined that consent is not involuntary for Fourth Amendment purposes if the consequence of refusal is an administrative penalty and not a criminal sanction. *See, e.g.*, *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2185; *McNeely*, 569 U.S. at 159–61, 133 S. Ct. at 1565–66. In *Pettijohn*, the majority considered whether "implied consent" to a blood draw obtained by law enforcement without a warrant was voluntary. *Pettijohn*, 899 N.W.2d at 25–38. For the purposes of a boating implied-consent statute, consent was not deemed voluntary in light of

administrative sanctions imposed by the statute and other relevant factors. *Id.* at 29, 36–38.

While the fact-based question in *Pettijohn* involved, in part, whether the civil sanctions threated by Iowa's implied-consent statute applicable to boating rendered the consent involuntary, the issue in this case is whether the State can "deem" a driver consented to waiver of search and seizure rights by merely driving on the roads of the state.

**B. United States Supreme Court Precedent Regarding Unconsented and Warrantless Bodily Invasions by the State.** The trail of United States Supreme Court cases dealing with blood draws begins with two due process cases. In *Rochin v. California,* law enforcement forcibly broke into the home of the accused and observed him place something in his mouth. 342 U.S. 165, 166, 72 S. Ct. 205, 206 (1952). The police unsuccessfully tried to pry the material out of his mouth. *Id.* The officers then took the accused to the hospital where a doctor pumped the suspect's stomach without his consent. *Id.* The pumping succeeded and the suspect regurgitated narcotic pills. *Id.* The *Rochin* Court concluded that the coerced body invasion "shocks the conscience" and was "too close to the rack and the screw" to avoid condemnation under the Due Process Clause. *Id.* at 172, 72 S. Ct. at 209–10.

In a second due process case, *Breithaupt v. Abram,* the Supreme Court considered the validity of a manslaughter conviction based, in part, on a blood draw obtained from an unconscious defendant without a warrant after a traffic accident. 352 U.S. 432, 433, 77 S. Ct. 408, 409 (1957). The *Breithaupt* majority rejected a due process challenge to the search on the merits, concluding that blood draws were not "brutal" or "offensive." *Id.* at 435, 77 S. Ct. at 410. With respect to a potential search and seizure violation, the *Breithaupt* Court held that no relief was available

because the exclusionary rule was not incorporated against the states under the Fourteenth Amendment. *Id.* at 434, 77 S. Ct. 409–10 (citing *Wolf v. Colorado*, 338 U.S. 25, 33, 69 S. Ct. 1359, 1364 (1949)).

Chief Justice Warren, joined by Justice Black and Justice Douglas, dissented. The Chief Justice found little meaningful difference between a stomach pump and an invasion of the skin through a needle. *Id.* at 440–42, 77 S. Ct. at 412–14 (Warren, C.J., dissenting). The searches in both *Rochin* and *Breithaupt* were involuntary. *Id.* The fact that Rochin was able to physically resist, while Breithaupt could not, was not consequential. *Id.* In a separate dissent, Justice Douglas, joined by Justice Black, observed that the indignity of an invasion is the same whether a person is conscious or unconscious. *Id.* at 442–44, 77 S. Ct. at 414 (Douglas, J., dissenting).

In *Schmerber v. California*, the Supreme Court considered the validity of a blood draw taken involuntarily from an *arrested* but hospitalized driver without a warrant. 384 U.S. 757, 758–59, 86 S. Ct. 1826, 1829 (1966). The defendant challenged the blood draw on Fourth and Fifth Amendment grounds. *Id.* at 759, 86 S. Ct. at 1829.

By a narrow 5–4 margin, the *Schmerber* Court sustained the warrantless blood draw as a search incident to arrest. *Id.* at 770–71, 86 S. Ct. at 1835–36. The *Schmerber* majority emphasized that ordinarily the involvement of a "neutral and detached magistrate" is required before allowing a law enforcement officer to "invade another's body in search of evidence of guilt is indisputable and great." *Id.* at 770, 86 S. Ct. at 1835 (quoting *Johnson*, 333 U.S. at 14, 68 S. Ct. at 369).

Nonetheless, the *Schmerber* majority emphasized that the officer reasonably believed, under the circumstances, that there was a threatened "destruction of evidence" based on the elimination of alcohol from the accused's system. *Id.* at 769, 86 S. Ct. at 1835. The *Schmerber* Court

stated that "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." *Id.* at 770–71, 86 S. Ct. at 1836. The majority explained that the police officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" *Id.* at 770, 86 S. Ct. at 1835 (quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S. Ct. 881, 883 (1964)).

Yet, the *Schmerber* Court did not want to give law enforcement sweeping authority or permit warrantless, unconsented bodily intrusions. According to the *Schmerber* majority:

> It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Id.* at 772, 86 S. Ct. at 1836.

Chief Justice Warren, Justice Black, and Justice Douglas dissented on Fifth Amendment grounds. *Id.* at 773, 86 S. Ct. at 1837 (Warren, C.J., dissenting). Justice Douglas separately dissented on Fourth Amendment grounds. *Id.* at 778, 86 S. Ct. at 1839–40 (Douglas, J., dissenting). He was having none of it. He wrote that "the Fourth Amendment . . . guarantees the right of the people to be secure 'in their persons.' No clearer invasion of this right of privacy can be imagined than forcible bloodletting of the kind involved here." *Id.* at 778–79, 86 S. Ct. at 1840 (citation omitted) (quoting U.S. Const., amend. IV).

In 2013, the Supreme Court in *McNeely*, returned to the question of unconsented blood draws. 569 U.S. 141, 133 S. Ct. 1552. In *McNeely*, a speeding driver crossed the center line and was stopped by a police officer. *Id.* at 145–46, 133 S. Ct. at 1556–57. The driver declined a preliminary blood test and was taken to a nearby hospital for a blood draw. *Id.* The police officer never attempted to secure a warrant. *Id.* The state trial court granted a motion to suppress, concluding that there were no exigent circumstances justifying the warrantless search. *Id.* The state supreme court agreed, finding that there were no factors justifying a warrantless search other than the natural dissipation of blood alcohol and that dissipation alone was insufficient to meet the exigent-circumstances exception to the warrant requirement. *Id.* at 147, 133 S. Ct. at 1557. On appeal to the Supreme Court, the state urged the adoption of a per se rule for intoxicated driving, namely, that exigent circumstances are always present in drunk-driving cases due to the dissipation of alcohol from the blood stream. *Id.* at 151–52, 133 S. Ct. at 1560.

The Supreme Court was fractured in *McNeely*. Writing for a majority, Justice Sotomayor rejected the state's per se rule for suspected drunk drivers. *Id.* at 165, 133 S. Ct. at 1568. Justice Sotomayor repeatedly emphasized the fact-based nature of the inquiry. *Id.* at 150–51, 133 S. Ct. at 1559–60. She noted that *Schmerber* relied on "special facts." *Id.* (quoting *Schmerber*, 384 U.S. at 771, 86 S. Ct. at 1836). She canvassed Fourth Amendment caselaw that demonstrated each case must be evaluated based on the facts and circumstances of the particular case. *Id.* at 148–51, 133 S. Ct. at 1558–60. According to Justice Sotomayor:

> In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case . . . it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be

determined case by case based on the totality of the circumstances.

*Id.* at 156, 133 S. Ct. at 1563. Further, citing *McDonald v. United States*, 333 U.S. at 456, 69 S. Ct. at 193, Justice Sotomayor emphasized that law enforcement could not create their own exigent circumstances to evade the warrant requirement. *Id.* at 152–53, 133 S. Ct. at 1561.

Finally, Justice Sotomayor noted that a sizeable majority of the states now have various remote methods, such as telephone, radio, email, and video conference, to apply for search warrants. *Id.* at 154–55, 133 S. Ct. at 1561–62. The Chief Justice noted in his opinion concurring in part and dissenting in part that judges often issue warrants in five to fifteen minutes. *Id.* at 173, 133 S. Ct. at 1573 (Roberts, C.J., concurring in part and dissenting in part).

A few years after *McNeely*, the Supreme Court, in *Birchfield v. North Dakota*, considered a challenge to a search where the suspect consented only after being informed of the consequences of failure to consent under a state's implied-consent law. 579 U.S. at ___, 136 S. Ct. at 2185–86. The question in *Birchfield* was whether, under the totality of circumstances, the consent obtained by law enforcement could be considered voluntary for purposes of the Fourth Amendment and therefore excuse the state from obtaining a warrant prior to the search. *Id.* at ___, 136 S. Ct. at 2186–87.

The *Birchfield* Court distinguished between blood tests and breath tests. *Id.* at ___, 136 S. Ct. at 2176–78. The *Birchfield* Court found that unlike breath tests, blood tests "implicat[e] significant privacy concerns." *Id.* at ___, 136 S. Ct. at 2178 (alteration in original) (quoting *Skinner*, 489 U.S. at 626, 109 S. Ct. at 1418). The *Birchfield* Court also noted that "a blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible

to extract information beyond a simple [blood alcohol] reading." *Id.* at ___, 136 S. Ct. at 2178. The *Birchfield* Court further observed,

> It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious . . . . But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.

*Id.* at ___, 136 S. Ct. at 2184–85.

The *Birchfield* Court concluded that the state could not establish voluntary consent for a blood draw through its implied-consent laws if the consequence of refusal to submit to a blood test was committing a criminal offense. *Id.* In short, the *Birchfield* Court permitted the state, through its implied-consent laws, to put some pressure on a suspect, such as a threat of administrative penalty, but not too much pressure. *Id.*

Finally, the Supreme Court considered whether law enforcement could obtain a warrantless blood draw from an unconscious driver suspected of driving while intoxicated in *Mitchell*, 588 U.S. ___, 139 S. Ct. 2525. Like this case, the state in *Mitchell* relied exclusively on the theory that warrantless blood draws may be supported by implied-consent laws. *Id.* at ___, 139 S. Ct. at 2532. The lower court accepted the state's theory as did the Supreme Court of Wisconsin. *Id.* A plurality of the United States Supreme Court, however, had different ideas. The plurality elected to decide the case based upon the exigent-circumstances exception to the warrant requirement. *Id.* at ___, 139 S. Ct. at 2534–37.

Justice Alito wrote for a four-person plurality. In canvassing the implied-consent precedents, the plurality noted that "our decisions have not rested on the idea that these laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize." *Id.* at ___, 139 S. Ct. at 2533. Instead, the Alito plurality

emphasized that the cases have dealt with "the specific constitutional claims in each case." *Id.* at ___, 139 S. Ct. at 2533.

The Alito plurality next considered the public policy grounds for obtaining blood draws. *Id.* at ___, 139 S. Ct. at 2535–37. The Alito plurality noted that "highway safety is a vital public interest," that federal and state laws have long maintained that tests measuring blood alcohol content aid the public safety interest, and that enforcing blood alcohol content laws "requires a test . . . accurate enough to stand up in court." *Id.* at ___, 139 S. Ct. at 2535–37.

The Alito plurality reviewed *Schmerber*, giving it a very narrow gloss. *Id.* at ___, 139 S. Ct. at 2537–38. The Alito plurality concluded that in the drunk-driving context, police are often "engag[ing] in a form of triage" in allocating resources and that law enforcement faces the choice of getting a warrant "to the detriment of critical health and safety needs." *Id.* at ___, 139 S. Ct. at 2538.

The Alito plurality then announced its conclusion. According to the Alito plurality, police would "almost always" be entitled to conduct a warrantless blood draw to measure a driver's blood alcohol content where the unconsciousness of the driver requires that the driver be taken to a hospital or similar facility. *Id.* at ___, 139 S. Ct. at 2539. But the Alito plurality did not rule out the possibility that a driver could show that police would not have taken a blood draw or that "police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id.* at ___, 139 S. Ct. at 2539.

There was one other important limitation in *Mitchell*. Justice Alito emphasized that the legal conclusions in the opinion rested upon the fact that "a breath test is impossible." *Id.* at ___, 139 S. Ct. at 2531. This important limitation appears in various forms throughout the plurality

opinion. *See, e.g., id.* at ___, 139 S. Ct. at 2531 ("[T]he driver is unconscious and therefore cannot be given a breath test."); *id.* at ___, 139 S. Ct. at 2534 ("[The police had] no reasonable opportunity to give Mitchell a breath test . . . ."); *id.* at ___, 139 S. Ct. at 2537 ("Thus, in the case of unconscious drivers, who cannot blow into a breathalyzer, blood tests are essential for achieving the compelling interests described above."). In other words, the sweeping, nearly per se rule in *Mitchell* is limited to situations involving an unconscious defendant.

Justice Thomas provided the fifth vote by concurring in the result of the case. *Id.* at ___, 139 S. Ct. at 2539–41 (Thomas, J., concurring in judgment). Justice Thomas, however, would hold that there is a per se or categorical exception to the warrant requirement where the "failure to act would result in 'the imminent destruction of evidence.'" *Id.* at 2540 (quoting *King,* 563 U.S. at 460, 131 S. Ct. at 1856). Justice Sotomayor, joined by Justice Ginsburg and Justice Kagan, dissented. *Id.* at ___, 139 S. Ct. at 2541–51 (Sotomayor, J., dissenting). She wrote that the plurality rested on the false premise that the states must choose between attending to emergency situations and obtaining a warrant. *Id.* at ___, 139 S. Ct. at 2541. She wrote that the answer under the Fourth Amendment was clear: "If there is time, get a warrant." *Id.* at ___, 139 S. Ct. at 2541.

Justice Sotomayor emphasized that there were "carefully circumscribed exceptions to the warrant requirement," including exigent circumstances. *Id.* at ___, 139 S. Ct. at 2543. She had a different view of *Schmerber* than the plurality, noting that "special facts" in that case "left the police with 'no time to seek out a magistrate and secure a warrant.'" *Id.* at ___, 139 S. Ct. at 2544 (quoting *Schmerber,* 348 U.S. at 770–71, 86 S. Ct. at 1836). She noted that attempts to categorically exclude blood draws from the warrant requirement were rejected in *McNeely* and

*Birchfield. Id.* at \_\_\_, 139 S. Ct. at 2544. According to Justice Sotomayor, the plurality engaged in a "considerable overgeneralization," which had been rejected in *McNeely. Id.* at \_\_\_, 139 S. Ct. at 2550 (quoting *McNeely*, 569 U.S. at 153, 133 S. Ct. at 1561). Justice Sotomayor wrote that "no one suggests that the warrant process should interfere with medical care" but in many cases, "the police will have enough time to address medical needs and still get a warrant before the putative evidence . . . dissipates." *Id.* at \_\_\_, 139 S. Ct. at 2550.

Justice Sotomayor acknowledge that drunk drivers are a cause for great concern on the road, but argued that it is " '[p]recisely because the need for action . . . is manifest' in such cases that 'the need for vigilance against unconstitutional excess is great.' " *Id.* at \_\_\_, 139 S. Ct. at 2551 (alteration and omission in original) (quoting *Skinner*, 489 U.S. at 635, 109 S. Ct. at 1423 (Marshall, J., dissenting)). Justice Sotomayor observed that "a small delay to obtain a warrant is hardly a recipe for lawless roadways." *Id.* at \_\_\_, 139 S. Ct. at 2548.

Justice Sotomayor also addressed the question of whether the Supreme Court should even consider the exigent-circumstances exception given the state of the record. *Id.* at \_\_\_, 139 S. Ct. at 2545–47. Justice Sotomayor noted that the State of Wisconsin had never argued for application of the exigent-circumstances exception in the litigation. *Id.* at \_\_\_, 139 S. Ct. at 2545–47. Further, she observed that the Court granted certiorari to answer "[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement." *Id.* at \_\_\_ n.5, 139 S. Ct. at 2546 n.5 (alteration in original). Sotomayor accused the plurality of taking on an issue that Wisconsin had "knowingly and intentionally abandoned." *Id.* at \_\_\_, 139 S. Ct. at 2545–46. The plurality thus operated without a developed factual

record or the usual give and take of the adversary process on legal questions. *Id.* at ___, 139 S. Ct. at 2546.

Justice Sotomayor concluded by accusing the plurality of "act[ing] recklessly" in deciding a significant constitutional issue without a factual record and fully developed adversary proceeding. *Id.* at ___, 139 S. Ct. at 2546. According to Justice Sotomayor,

> The plurality today carries that burden [demonstrating the availability of exigent circumstances exception] for a State that never asked it to do so, not only here but also in a scattershot mass of future cases. Acting entirely on its own freewheeling instincts—with no briefing or decision below on the question—the plurality permits officers to order a blood draw of an unconscious person in all but the rarest cases, even when there is ample time to obtain a warrant. The plurality may believe it is helping to ameliorate the scourge of drunk driving, but what it really does is to strike another needless blow at the protections guaranteed by the Fourth Amendment.

*Id.* at ___, 139 S. Ct. at 2551.

Justice Gorsuch in a brief dissenting opinion noted certiorari was granted to consider whether Wisconsin drivers impliedly consent to blood draws "thanks to a state statute." *Id.* at ___, 139 S. Ct. at 2551 (Gorsuch, J., dissenting). The Court, Justice Gorsuch observed, chose to decide the case "on an entirely different ground." *Id.* at ___, 139 S. Ct. at 2551. Justice Gorsuch wrote that "the application of the exigent circumstances doctrine in this area poses complex and difficult questions that neither the parties nor the courts below discussed." *Id.* at ___, 139 S. Ct. at 2551. As a result, Justice Gorsuch "would have dismissed [the petition] as improvidently granted." *Id.* at ___, 139 S. Ct. at 2551.

**C. State Court Precedents Involving Warrantless and Unconsented Invasions of Bodily Integrity by the State.**

1. *Implied consent.* I now turn to an examination of state court precedents regarding the constitutionality of invasions of bodily integrity by the state based on "implied consent" laws where the suspect has not given actual consent. As will be apparent, there are many jurisdictions that have come to the conclusion that implied-consent laws are not a stand-alone exception to the warrant requirement under both the Fourth Amendment and the search and seizure provisions of their state constitutions. What follows below is a summary of the important reasons supporting these state court decisions.

Many of the state court cases rely upon Supreme Court cases in their discussion of the validity of warrantless searches of unconscious persons based upon implied-consent statutes. Many cases also cite to parallel search and seizure provisions under the applicable state constitutions. The state cases, however, do not generally provide a separate analysis of state constitutional provisions.

Many state court cases involving unwarranted bodily invasions of unconscious people by the state focus on the notion that in order to have "consent" sufficient to avoid the warrant requirement, the consent must be the product of a conscious mind in order to be "voluntary." The notion of consent as a voluntary act has existed in Anglo-American jurisprudence for time out of mind. A corollary to the requirement of a conscious mind is the necessity of the power to limit or revoke consent. Because the features of a conscious mind are not present when blood draws are taken from an unconscious person and an unconscious person is not capable of limiting or revoking consent, state courts have repeatedly pounded that the voluntariness required for a person to waive the warrant requirement

is not present. *See, e.g., State v. Havatone,* 389 P.3d 1251, 1255 (Ariz. 2017) ("We conclude that the unconscious clause can be constitutionally applied only when case-specific exigent circumstances prevent law enforcement officers from obtaining a warrant."); *People v. Arredondo,* 199 Cal. Rptr. 3d 563, 573 (Ct. App. 2016) ("[C]onsent of this kind cannot be characterized as 'free[].' " (alteration in original) (quoting *People v. Michael,* 290 P.2d 852, 853 (Cal. 1955) (en banc))); *People v. Ling,* 222 Cal. Rptr. 3d 463, 469 (App. Dep't Super. Ct. 2017) ("[I]t needs no citation of authorities to state that an unconscious man is incapable of giving consent." (quoting *Carrington v. Superior Ct.,* 107 Cal. Rptr. 546, 549 (Ct. App. 1973))); *State v. Wulff,* 337 P.3d 575, 581 (Idaho 2014) ("[I]rrevocable implied consent operates as a per se rule that cannot fit under the consent exception because it does not always analyze the voluntariness of that consent."); *Byars v. State,* 336 P.3d 939, 946 (Nev. 2014) (en banc) ("[T]he statute does not allow a driver to withdraw consent, thus a driver's so-called consent cannot be considered voluntary."); *State v. Romano,* 800 S.E.2d 644, 653 (N.C. 2017) ("The State did not present any other evidence [other than the implied-consent statute] of consent or argue that under the totality of the circumstances [that the] defendant consented to a blood draw."); *Commonwealth v. Myers,* 164 A.3d 1162, 1173 (Pa. 2017) ("[C]onsent always must be revocable."); *State v. Fierro,* 853 N.W.2d 235, 241–42 (S.D. 2014) (holding that when the trial court found no consent, the state did not meet the burden of showing an exception to warrant requirement); *State v. Villarreal,* 475 S.W.3d 784, 799 (Tex. Crim. App. 2014) ("[A] . . . necessary element of valid consent is the ability to limit or revoke it.").

The state court cases involving bodily invasions of unconscious people without a warrant by the state further emphasize that whether consent for purposes of search and seizure law has been provided by an

individual raises a question of fact and not law. Thus, the notion of "implied consent" pursuant to a statute is said to be an inaccurate description. As noted by a California appellate court in *People v. Arredondo*,

> "[I]mplied consent" is a misleading, if not inaccurate, label in this context. Certainly consent sufficient to sustain a search may be "implied" as well as explicit, but it is nonetheless actual consent, "implied" only in the sense that it is manifested by conduct rather than words.

199 Cal. Rptr. 3d at 571. In other words, " 'implied consent' in the statute does not mean that police may require drivers to consent to [testing] simply because they drove." *State v. Baird*, 386 P.3d 239, 247 (Wash. 2017) (en banc). Instead, it means that "in situations that the legislature has specified, if a driver chooses not to consent, the driver agrees that he or she will incur the consequences of that decision." *Id.* (footnote omitted); *see also State v. Padley*, 849 N.W.2d 867, 876 (Wis. Ct. App. 2014) (" 'Implied consent' is not an intuitive or plainly descriptive term with respect to how the implied consent law works. We suspect that it is a source of confusion."). The *Arredondo* court further noted that under the law of contracts, consent may be implied but it is consent "in fact," inferred from conduct that constitutes an actual manifestation of consent. 199 Cal. Rptr. 3d at 571; *see also Villareal*, 475 S.W.3d at 799 (stating that the question of the voluntariness of consent is a fact question).

The state court cases involving unwarranted bodily invasions of unconscious people by the state also express concern regarding the power of the state legislature to override constitutional commands in implied-consent statutes. The *Arredondo* court discussed this concern at length, noting that "[a] state legislature does not have the power to 'deem' into existence 'facts' operating to negate individual rights." 199 Cal. Rptr. 3d

at 574.  But further, the *Arredondo* court worried about the implications of legislatively-imposed consent:

> It is far from implausible, for example, that a legislative body—state or federal—might decree, in the name of public safety or national security, that the use of the mails, or the phone lines, or the Internet—all of which rely to a greater or lesser extent on publicly owned property or facilities or publicly provided services—constitutes consent to search the contents of all communications thus conducted.  Consent to search homes might be "deemed" to be given by anyone taking advantage of various publicly provided or subsidized privileges—like use of public utilities, libraries, or schools.  Consent to search the person might be "deemed" to be given by use of a public sidewalk or occupancy of a public place.

*Id.* at 577–78; *see also Hannoy v. State*, 789 N.E.2d 977, 987 (Ind. Ct. App. 2003) ("To hold that the legislature could nonetheless pass laws stating that a person 'impliedly' consents to searches under certain circumstances where a search would otherwise be unlawful would be to condone an unconstitutional bypassing of the Fourth Amendment."); *Meyers*, 164 A.3d at 1174 ("[L]egislative proclamation that motorists are deemed to have consented to chemical tests is insufficient to establish the voluntariness of consent that is necessary to serve as an exception to the warrant requirement.").

Some of the cases focus on the fact that where officers can practically obtain a warrant without significantly undermining the efficiency of such search, the officers are required to obtain the warrant. *Bailey v. State*, 790 S.E.2d 98, 103 (Ga. Ct. App. 2017).

2. *Exigent circumstances.*  I now turn to state court cases considering whether the exigent-circumstances exception applies in the context of obtaining blood draws from unconscious drivers suspected of driving while intoxicated.  Using *Schmerber* as a springboard, the states are decidedly split.  Some courts are relatively demanding in requiring the

state to make a strong showing of exigent circumstances, while other courts seem more receptive to warrantless searches of unconscious drivers under the exception.

For example, in *State v. Bohling,* the Supreme Court of Wisconsin held, over a dissent, that *Schmerber* created a per se exigent exception to the warrant requirement. 494 N.W.2d 399, 401–02, 406 (Wis. 1993). The *Bohling* majority relied upon: (1) the language in *Schmerber*; (2) the language in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. at 624–25, 109 S. Ct. at 1416–17, where the court minimized the intrusive nature of blood draws; (3) interpretations of *Schmerber* by other courts; and (4) an examination of the state's interest in drunk-driving laws. *Bohling,* 494 N.W.2d at 402.

But, in contrast, the Supreme Court of Utah came to the opposite conclusion in *State v. Rodriguez.* 156 P.3d 771, 774–80 (Utah 2007). The Utah court relied upon Justice Brennan's later explanation of *Schmerber,* that "[t]he intrusion perhaps implicated *Schmerber*'s most personal and deep-rooted expectations of privacy, and the Court recognized that Fourth Amendment analysis thus required a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable." *Id.* at 775 (alteration in original) (quoting *Winston v. Lee,* 470 U.S. at 760, 105 S. Ct. at 1616).

There are at least three state court cases dealing with the application of the exigent-circumstances exception to the warrant requirement in the context of dissipation of marijuana metabolites. In *Byars v. State,* the Supreme Court of Nevada noted that "[t]here [was] no indication in the record that Trooper Murwin was prevented from seeking a warrant telephonically." 336 P.3d at 944. On the record of the case, the court held

that the state failed to establish exigent circumstances to justify the warrantless search.  *Id.* at 944–45.

A similar result occurred in *City of Seattle v. Pearson*, 369 P.3d 194 (Wash. Ct. App. 2016).  In that case, a Washington appellate court observed,

> Absent other extenuating circumstances, the natural dissipation of THC in a suspect's bloodstream will constitute an exigency sufficient to forgo the warrant requirement only if the party seeking to introduce evidence of a warrantless blood test can show that waiting to obtain a warrant would result in losing evidence of the defendant's intoxication.

*Id.* at 200.  Further, the Washington court went on to state,

> [W]e hold that the natural dissipation of THC from the bloodstream is a relevant consideration in an exigent circumstances analysis but is not a per se exigent circumstance that justifies an exception to the warrant requirement for nonconsensual blood draws in DUI cases.

*Id.* at 201.  Based on the record, the court concluded that the warrantless blood draw was not justified in that case.  *Id.*

In *State v. Anderson*, however, a Washington appellate court concluded, based on the record, that the state had made an adequate showing of exigent circumstances in an alcohol and THC case based on the facts and circumstances presented.  447 P.3d 176, 182 (Wash. Ct. App. 2019).

### D.  Iowa Cases Involving Warrantless Blood Draws.

1. *Implied consent.*  Although they do not deal specifically with implied consent, we have considered a number of search and seizure cases that generally applied the notion of consent found in *Schneckloth* under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.  In these cases, we applied the familiar fact-based, totality-of-the-circumstances test.  In some cases, we found

that the state failed to show valid consent. *See, e.g., Reinier,* 628 N.W.2d at 467–69; *State v. Horton,* 625 N.W.2d 363, 364 (Iowa 2001) (en banc). In other cases, we held that the state successfully demonstrated consent. *State v. Reinders,* 690 N.W.2d 78, 84 (Iowa 2004). These cases show consistent application of a nuanced, case-specific approach to consent.

We considered a question of a categorical, nonfact-based approach in *State v. Ochoa.* 792 N.W.2d at 287–91. In *Ochoa,* the state asserted that its executive action in imposing "search conditions" in parole agreements authorized law enforcement officials to search the residence of a parolee at any time and for any reason. *Id.* at 262. We noted that the scope of the state's asserted power was "stunningly broad." *Id.* at 287–88. We expressed concern about the "categorical nature" of the treatment of the issue by the United States Supreme Court. *Id.* at 289. We rejected the artificial "act of grace," "waiver," or "constructive custody" theories. *Id.* at 290–91. We noted that the asserted power of the state too closely resembled a general warrant, where a search could be conducted without any meaningful mechanism of control. *Id.* at 291. Although the case did not expressly involve consent, we showed in *Ochoa* firm resistance to broad, generalized policies imposed by the executive branch designed to defeat individualized claims of search and seizure protection under the Iowa Constitution. *See id.*

We considered the issue of consent in the context of a traffic stop in *Pals.* 805 N.W.2d at 770–71. In *Pals,* we concluded, based again on the totality of circumstances, that Pals's consent could not be considered voluntary under article I, section 8 of the Iowa Constitution. *Id.* at 782–84. Among other factual factors, we considered the fact that Pals was subject to a pat-down search, that he was detained in a police vehicle, that he was not told that he was free to leave, and that the officer had not told

Pals that the business related to the stop was concluded. *Id.* Our review of the consent issue was clearly fact-intensive.

We considered an important consent issue in *State v. Baldon.* 829 N.W.2d at 789–91. In *Baldon*, the question was whether a signature by a parolee convicted of drug offenses on a parole agreement that consented to future warrantless searches of his home, vehicle, and belongings was a valid consent under article I, section 8 of the Iowa Constitution. *Id.* at 787–91. The courts across the country were split on the issue. *Id.* at 792–95. After review of the cases, we sided with the jurisdictions that held that the execution of a parole agreement did not categorically establish consent. *Id.* at 800–03. A prospective consent-to-search provision in a parole agreement did not solely give rise to a valid consent. *Id.* at 800. We noted that there was no additional evidence in the record to reveal Baldon voluntarily consented to a search. *Id.* at 802. But the state relied solely on the parole agreement, which we found was insufficient. *Id.* We stated that "more is needed." *Id.* at 803.

The above principles have generally been applied by this court in the context of claims of consent via implied-consent statutes. In *State v. Garcia*, we considered whether an individual voluntarily submitted to a blood test when an officer invoked implied-consent procedures. 756 N.W.2d 216, 220 (Iowa 2008). We emphasized that in order to be voluntary, the consent must be "freely made, uncoerced, reasoned, and informed." *Id.* The issue of consent was not "deemed" to be satisfied merely by the statute, but needed to be proved, as a matter of fact, by the state. *Id.* at 220–21, 223.

A second implied-consent case is *State v. Overbay*, 810 N.W.2d 871 (Iowa 2012). In that case, we determined that consent could be voluntary under an implied-consent regime provided that the decision to submit to

the test was "a reasoned and informed decision." *Id.* at 876 (quoting *State v. Bernhard*, 657 N.W.2d 469, 473 (Iowa 2003)). Again, the statute itself was insufficient for consent to be "deemed" to have been satisfied. *Id.* Instead, the state was required to prove that the consent, pursuant to the statute, satisfied the voluntariness requirement. *Id.* at 879–80.

Finally, we considered the issue of implied consent in *Pettijohn.* 899 N.W.2d at 25–29. In that case, we considered the constitutionality of a warrantless breath test obtained from a boater suspected of drunk boating. *Id.* at 25–26. We canvassed jurisdictions, noting that consent must be voluntary and must be subject to limitation or withdrawal. *Id.* at 28. Consistent with *Garcia* and *Overbay*, we rejected the state's claim that the implied-consent statute dealing with drunken boaters provided per se consent sufficient to justify the warrantless breath test in the case. *Id.* at 29. We therefore held that the consent implied by the statute did not automatically permit a warrantless search consistent with article I, section 8 of the Iowa Constitution. *Id.*

We then turned to the question of whether consent was given by Pettijohn under the totality of circumstances to be sufficiently voluntary to pass constitutional muster under article I, section 8. *Id.* at 29–38. We canvassed the facts, including the intoxication of the boater, the detention of the boater at the police station, the inaccuracy of the implied-consent agreement read to him by the officers, and the imposition of a penalty of at least $500 for failing to provide consent. *Id.* at 32–38. We concluded that in light of all the facts and circumstances, consent was not voluntary in the case. *Id.* at 37–38.

The majority opinion was qualified in one important respect. According to the majority, the evaluation of the totality-of-the-circumstances test could lead to different outcomes in a different case. *Id.*

at 38. The majority stated "[a]ny decision relating to operating a motor vehicle while under the influence will have to wait for another case raising its constitutionality." *Id.*

2. *Exigent circumstances.* In *State v. Findlay,* we considered whether a search of the body of an unconscious person not under arrest amounted to an unreasonable invasion of privacy. 259 Iowa 733, 735, 145 N.W.2d 650, 651–52 (1966). The *Findlay* court recognized that a warrant was generally required and that the administrative "inconvenience to the officers" and the "delay necessary to prepare the papers and present the evidence to the magistrate" is not an "exceptional circumstance" sufficient to avoid the warrant requirement. *Id.* at 739, 145 N.W.2d at 654. But the *Findlay* court emphasized that "the situation [was] different where the delay will cause the destruction of the evidence, and where . . . there is a showing the officer believes delay will result in a loss of the vital evidence." *Id.* at 740, 145 N.W.2d at 654.

Although the opinion is cryptic, it is an early version of the exigent-circumstances exception to the warrant requirement in the context of an unconscious driver suspected of driving while intoxicated. On the one hand, it is clear that expressions of administrative convenience clearly are insufficient to avoid the warrant requirement. On the other hand, when law enforcement produces expert testimony stating that, under the facts and circumstances, the state faced imminent destruction of evidence, the state might not be required to seek a warrant. *Findlay* is a something for everyone case.

There are two more recent Iowa exigent-circumstances cases that provide additional guidance. The first case is *State v. Johnson,* 744 N.W.2d 340 (Iowa 2008). The case concerned a driver involved in an accident and suspected of drunk driving and was arrested and taken to the Des Moines

police station.  *Id.* at 341.  After the suspect refused a breath test, he was taken to the hospital and a blood sample was taken without his consent. *Id.*

In *Johnson*, we directly confronted the two strands of authority emanating from *Schmerber*.  *Id.* at 343–45.  We rejected the per se approach to exigency adopted by the Supreme Court of Wisconsin in *Bohling*, 494 N.W.2d at 402, in favor of the more fact-based approach adopted by the Supreme Court of Utah in *Rodriguez*, 156 P.3d at 776. *Johnson*, 744 N.W.2d at 344.

The second case is *State v. Harris*, 763 N.W.2d 269 (Iowa 2009) (per curiam).  In *Harris*, we considered a warrantless blood draw where the driver in a single vehicle accident had killed a pedestrian.  *Id.* at 270. Under the applicable statute, a warrantless blood draw was permitted if "[t]he peace officer reasonably believes the officer is confronted with an emergency situation in which the delay necessary to obtain a warrant . . . threatens the destruction of the evidence."  *Id.* at 271–72 (quoting Iowa Code § 321J.10A(1)(*c*) (2006)).

In *Harris*, we again considered the question of the scope of *Schmerber*.  *Id.* at 272–73.  We again noted that *Schmerber* required more than the mere dissipation of alcohol to justify a warrantless search.  *Id.* at 272.  We also stressed the *Schmerber* language that for the warrantless blood draw in that case, there was not time to obtain a warrant and that "given these special facts," a warrantless search was permitted.  *Id.* (emphasis omitted) (quoting *Schmerber*, 384 U.S. at 770–71, 86 S. Ct. at 1835–36).  In short, we clearly aligned with the line of cases that interpreted *Schmerber* to be a case about "special facts" and not a case about the categorical endorsement of warrantless searches for blood draws.  *See id.*

We then turned to analysis of the facts in *Harris.* The record showed that the officer was acting at the direction of the county attorney with respect to the warrant application. *Id.* at 273–75. The officer's testimony included the following:

> Q: . . . [C]ould you tell the Court what the emergency situation was in this case that caused you to draw blood . . . without a warrant . . . . A: Well, I was following the guidelines from [the county attorney]. . . .
>
> . . . .
>
> Q: Was the emergency situation that [the county attorney] says take the blood? A: This is what the county attorney—we had all what we thought we may have, what we might have, and this was the decision of the county attorney.
>
> Q: And you followed his instructions? A: And I followed his instructions.

*Id.* at 274 n.2 (first alteration and first, second, third, and fifth omissions in original).

As a result, the suppression was affirmed. *Id.* at 275. *Harris* plainly stands for the proposition that the reasonability component of the exigent-circumstance exception, at least in Iowa, has an objective and subjective component.

**IV. Discussion of the Merits.**

**A. Implied Consent.** In my view, the precise issue presented and decided by the district court, and raised on appeal, is whether an unconscious driver may be "deemed" to have consented to a blood draw under Iowa's implied-consent statute consistent with the Fourth Amendment and article I, section 8, has a clear answer: No.

At the outset, as noted by the authorities in more than a dozen states, the narrow and jealously guarded theory of consent to avoid the warrant requirement in search and seizure cases is fact-based. Whether

one operates under the consent approach of *Schneckloth* or the more demanding waiver theory of *Zerbst*, the notion of the surrender of constitutional rights by the individual requires a deliberate and voluntary act. The basic premise of consent is that it is an act of free will, given voluntarily. And, it has been repeatedly said, in order for consent to be voluntary, it must be subject to limitation and, ultimately to revocation. *See, e.g., Jimeno*, 500 U.S. at 252, 111 S. Ct. at 1804. *But see* Iowa Code § 321J.7 (prohibiting revocation of "implied consent"). The notion of voluntary consent is a question of fact and is a constant across different fields of law. *See, e.g., Johnson v. Associated Milk Processors*, 886 N.W.2d 384, 390 (Iowa 2016) (holding in contract law consent may be express or implied "from acts and conduct" (quoting *Davenport Osteopathic Hosp. Ass'n of Davenport, Iowa v. Hosp. Serv., Inc.*, 261 Iowa 247, 253, 154 N.W.2d 153, 157 (1967))); *State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988) (en banc) (holding that determining consent to intercourse is "the consequential fact" in a sexual abuse case); *Jarvis v. Stone*, 216 Iowa 27, 35, 247 N.W. 393, 397 (1933) (determining that whether an automobile is driven without the owner's consent is a question of fact).

None of these features are present when consent is "deemed" to have occurred solely based on the legislature's declaration in Iowa's implied-consent statute. *See* Iowa Code § 321J.6. Consistent with the vast majority of state court cases, our caselaw under article I, section 8 has consistently rejected artificial, categorical approaches to consent, and instead requires the state to show that consent was truly voluntary based on an individualized, fact-based inquiry. *See, e.g., Pettijohn*, 899 N.W.2d at 29–38; *Baldon*, 829 N.W.2d at 800–03; *Overbay*, 810 N.W.2d at 879–80; *Ochoa*, 792 N.W.2d at 287–91; *Garcia*, 756 N.W.2d at 220–23.

Further, the notion that a driver is "deemed" to have consented to a blood draw solely based upon driving on the highways imposes an unconstitutional condition on a government benefit. This issue was explored in one of the amicus briefs filed in *Mitchell*. *See* Brief of Amicus Curiae California DUI Lawyers Ass'n in Support of Petitioner at 4–10, *Mitchell*, 588 U.S. ___, 139 S. Ct. 2525 (2019) (No. 18–6210), 2019 WL 1092735, at *4–10 [hereinafter *Mitchell* Amicus Brief]. The brief noted that in *Frost v. Railroad Commission*, 271 U.S. 583, 46 S. Ct. 605 (1926), the Supreme Court struck down a state law that, as a condition of operating on its highways, required private carriers to become public carriers. *Mitchell* Amicus Brief, at 4–5, 2019 WL 1092735, at *4–5. The Supreme Court declared:

> If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

*Frost*, 271 U.S. at 594, 46 S. Ct. at 607; *see also*; *Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595, 606, 133 S. Ct. 2586, 2595 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."); *Arredondo*, 198 Cal. Rptr. 3d at 570–71, 577–78 (listing possible extension of unconstitutional conditions). Similarly, the amici argued, implied-consent laws contain the implied condition of forfeiting one's search and seizure rights against a warrantless search in order to drive. *Mitchell* Amicus Brief, at 7, 2019 WL 1092735, at *7.

If the door is open to unconstitutional conditions, the amici suggested, the end result could severely undermine our panoply of

constitutional rights. *Id.* at 9–10, 2019 WL 1092735, at *9–10. The amici cited *United States v. Scott*, where the Ninth Circuit noted:

> Government is a monopoly provider of countless services, notably law enforcement, and we live in an age when government influence and control are pervasive in many aspects of our daily lives. Giving the government free rein to grant conditional benefits creates the risk that the government will abuse its power by attaching strings strategically, striking lopsided deals and gradually eroding constitutional protections.

450 F.3d 863, 866–67 (9th Cir. 2006); *see also* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1492 (1989).

If implied-consent statutes can, as a matter of law, require all drivers to waive search and seizure protections with respect to warrantless blood draws, may the state, then, pass a statute declaring that all drivers must waive search and seizure protections for their cell phones, their car interiors, their glove compartments, or the persons in their car? And the reach of statutorily created consent could extend well beyond the highway. May the government condition the granting of a building permit on implied consent to search the premises without a warrant? *See Elkins v. District of Columbia*, 710 F. Supp. 2d 53, 56–61, 65 (D.D.C. 2010), *vacated on other grounds*, 690 F.3d 554 (D.C. Cir. 2012). In short, the replacement of the established, fact-based, constitutionally required voluntary consent with a statutory system of trumps would have the potential to eliminate the effectiveness of our State and Federal Bill of Rights. That sharp sound one hears in the background is George Ells and his compatriots screaming, "NO, NO, NO!" to the State's claim of legislative supremacy to override the precious terms of article I of the Iowa Constitution.

And, the notion that the legislature can as a matter of law "deem" a driver to have consented to a search by simply using the roads amounts to a general warrant or writ of assistance—the very reasons for the

development of American search and seizure law. *See Ochoa*, 792 N.W.2d at 263–74; *see also Riley*, 573 U.S. at 403, 134 S. Ct. at 2494. If all of the tens of thousands of persons driving on the Iowa roads each day "consent" by force of law to "waive" the constitutional protections of the Fourth Amendment and article I, section 8, is that not a legislative enactment of a general warrant? In *Maryland v. King*, Justice Scalia described the hated general warrants as "warrants not grounded upon a sworn oath of a specific infraction by a particular individual, and thus not limited in scope and application." 569 U.S. 435, 466, 133 S. Ct, 1958, 1980 (2013) (Scalia, J., dissenting). Isn't that exactly what Iowa Code sections 321J.6 and 321J.7 do? Doesn't the implied-consent statute mean that blood draws for everyone on the open road are now permitted without an oath, without particularity, and unlimited in scope? Preventing the state from having the power to generally search large groups of people without a warrant was *precisely* the abuse that search and seizure law was designed to prevent.

For all of the above reasons, even the United States Supreme Court is, currently at least, unwilling to justify warrantless searches of an unconscious person based on implied-consent statutes. From a process point of view, *Mitchell* is surely a procedural pretzel, with the Supreme Court taking a case to resolve the question of whether implied consent permitted the warrantless search of an unconscious driver, and then twisting the case to decide the unraised question of exigent circumstances that was not briefed by the parties and, indeed, was conceded by the state below. This extraordinary maneuver suggests the Supreme Court did not want to touch the hot stove issue of warrantless searches based on the legal concept of implied consent.

In any event, I would reject the notion that a statute can "deem" the fact of consent under the Iowa Constitution in light of the free will nature

of consent embraced in the caselaw, rejection of unconstitutional conditions, the similarity of implied consent to a general warrant or writ of assistance, and our consistent recent caselaw. *See Pettijohn*, 899 N.W.2d at 28–29 (rejecting mere existence of statutory implied consent to permit administration of a warrantless test and stating "we must determine, under the totality of the circumstances, whether Pettijohn effectively consented to submit to the breath test"); *Baldon*, 829 N.W.2d at 802 ("Considering our obligation to ensure that consent remains a doctrine of voluntariness that functions with integrity, we conclude a parole agreement containing a prospective search provision is insufficient evidence to establish consent."); *Ochoa*, 792 N.W.2d at 291 ("[A] parolee may not be subjected to broad, warrantless searches by a general law enforcement officer without any particularized suspicion or limitations to the scope of the search.").

The only rationale for avoiding a warrant presented by the State at the district court was that consent was "deemed" under Iowa's implied-consent statute. The State made no effort to show exigent circumstances to avoid the warrant requirement. As a result, McGee's motion to suppress should have been granted. I would thus vacate McGee's conviction and remand the matter to the district court.

**B. Exigent Circumstances.**

1. *Preservation of error.* There is an initial issue of preservation of error. As is apparent from an examination of the transcript of the legal argument at the hearing, the State made no claim at all of exigent circumstances below. Further, the district court made no factual or legal findings on the issue. This is thus not a case where a change of law occurred while a claim of exigency was pending before the court. The State simply did not claim exigency, period.

A decision not to pursue exigent circumstances would not have been careless as, under our caselaw, there was little chance that the State could prevail on the issue. The facts reveal that the case has a striking parallel to *Harris*, where we held that if the only reason advanced for not getting a warrant was the directives of the prosecutor, exigent circumstances have not been established. 763 N.W.2d at 270, 275. A decision not to proceed would be consistent with a strategic decision not to present a meritless claim.

We have previously considered a case where the state did not make a claim in the district court during a suppression hearing and then attempted to resurrect it for the first time on appeal. *See Baldon*, 829 N.W.2d at 789. In *State v. Baldon*, the state, before the district court, asserted that Baldon had consented to a search through a parole agreement, but did not raise any generalized argument under a "balancing test" or "special needs" theory. *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 748 (1985) (Blackmun, J., concurring in judgment)). We stated:

> The State did not introduce evidence of any particular need for the parole officer to search Baldon, either predicated on individual suspicion, background information particular to Baldon that would have been known to the parole officer, or the general mission of parole. Thus, the only issue we address on appeal is whether a parole agreement containing a consent-to-search clause renders suspicionless and warrantless searches of parolees reasonable under the search and seizure clause of the Iowa Constitution.

*Id.* at 789–90. A dissent argued that we should have considered the issues not presented because of caselaw developments that occurred after the district court proceedings. *Id.* at 847 (Mansfield, J., dissenting). The question of issue preservation in this case presents nearly identical

circumstances as the issue preservation question presented and decided in *Baldon.*

We have stated that "[i]t is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Here, there is no question that the State did not raise exigent circumstances before the district court. Thus, if the preservation ruling in *Meier v. Senecaut*, as applied in *Baldon*, is to be followed, we would not address the exigent-circumstances issue raised by the State for the first time on appeal. I would follow our precedent and decline to consider the exigent-circumstance question which the State did not raise in the trial court below.

The problem here is especially acute when we are asked to depart from past precedent and adopt the newly developed approach in *Mitchell* to a blood draw designed to obtain evidence of marijuana use. No record has been developed to guide us in the potential fashioning or refurbishing of our traditional approach to exigent circumstances. We should not engage in significant constitutional innovations without a thorough record below.

2. *Discussion.* If I were to address the question posed on appeal as a first responder, without a record or decision of the district court on the issue, I would find the constitutional innovations to the Fourth Amendment law introduced by the Supreme Court in *Mitchell* problematic and inapplicable to our consideration of the question under article I, section 8 of the Iowa Constitution. To the extent I would look to federal caselaw for guidance, I find the opinions of Justice Sotomayor in *McNeely* and *Mitchell* far more persuasive than the *Mitchell* plurality opinion. Further, I would rely on the better reasoned traditional Iowa and state law

precedents that have consistently employed a narrow exception to the warrant requirement based on exigent circumstances demonstrated by the state, on the record, of a compelling need and impracticability of obtaining a warrant.

The problems with *Mitchell* are manifest. First, remarkably, it shifts the burden to the defendant of showing that an exception to the warrant requirement does not exist. *See Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539. That innovation is inconsistent with our caselaw and is an undesirable development. Obtaining a warrant is the norm and exigent circumstances the exception. The burden of proving an exception to the generally applicable rule, especially one of such importance as the warrant requirement, should rest with the state. *See, e.g., Welsh*, 466 U.S. at 749–50, 104 S. Ct. at 2097 (stating the government bears a "heavy burden" to show exigent circumstances); *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010) ("The officers bear the burden of establishing that the threats posed exigent circumstances justifying the warrantless entry."); *Hopkins v. Bonvicino*, 573 F.3d 752, 764 (9th Cir. 2009) ("[A]s with other exceptions to the warrant requirement, the Government bears the burden of demonstrating that the search at issue meets the[] parameters." (quoting *United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005))); *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996) ("To excuse the absence of a warrant, the burden rests on the State to show the existence of these exceptional situations.").

Further, the information necessary to prove the exception is in the possession of the state, not the defendant. *See, e.g., N.Y., New Haven & Hartford R.R.*, 355 U.S. at 256 n.5, 78 S. Ct. at 214 n.5 ("The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his

adversary."); *cf. Breese v. City of Burlington*, 945 N.W.2d 12, 23 (Iowa 2020) ("Given the function of the state-of-the-art defense, placing the burden on the party challenging the defense is illogical because the defendant will normally have access to information regarding when the improvement was made."). Why could the State not obtain a warrant? How long would it have taken? What other tasks did the officers have to do? How many were available? Are we prepared to provide the defendant with the kind of discovery necessary to attempt to put the needle through the camel's eye created by *Mitchell*? If not, have we created an impossible burden? Indeed, was that not the goal in *Mitchell*? And is the *Mitchell* Court ensuring that the exigent-circumstances exception is "narrow and jealously guarded?" At least one state supreme court has already rejected the burden shifting in *Mitchell*. *See State v. Key*, 848 S.E.2d 315, 316 (S.C. 2020) ("We have carefully considered the *Mitchell* holding and conclude we will not impose upon a defendant the burden of establishing the absence of exigent circumstances.").

Second, even assuming the defendant is entitled to robust discovery, the substantive standard is nearly impossible for a defendant to show. A defendant must prove a remarkable negative, "that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539. As the Supreme Court has noted, "as a practical matter it is never easy to prove a negative." *Elkins v. United States*, 364 U.S. 206, 218, 80 S. Ct. 1437, 1444 (1960); *see also Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 898 (Iowa 2015) ("Plaintiffs are rarely required to prove a negative."); *Commonwealth v. Buonopane*, 599 A.2d 681, 683 n.2 (Pa. 1991) ("[A] virtually impossible burden [is] placed upon a party required to prove a negative." (quoting *Commonwealth v. DeHart*, 516 A.2d 656, 668 (Pa.

1986))). Police always have other things they could be doing. Under *Mitchell*, obtaining a warrant in a drunk-driving case may be excused by officers who state they had other responsibilities. Indeed, police departments can structure their staffing arrangements to ensure that a warrant is never required in a drunk-driving case because of thin staffing. *Mitchell* does not mention the traditional view that administrative convenience does not justify evasion of the warrant requirement. *See Coolidge*, 403 U.S. at 481, 91 S. Ct. at 2046 (stating that the constitutional command of the warrant requirement "is not an inconvenience to be somehow 'weighed' against the claims of police efficiency.").

Third, the approach in *Mitchell* is inconsistent with our prior caselaw. For instance, consider *Harris* where we rejected the state's effort to escape the warrant requirement where a warrant was not obtained as a result of adherence to a policy of the local prosecutor. 763 N.W.2d at 275. Here, the record before the district court shows that Officer Fricke did not pursue a warrant based upon his understanding of department policy. A rational state actor would have recognized that there were no "special facts" to support exigent circumstances and *Harris* foreclosed any argument based on compliance with policy.

Fourth, it is inconsistent with the case-by-case approach that has been applied to determining exigency. *McNeely*, of course, dealt with the dissipation of alcohol, but its principles apply here with full applicability. Indeed, the caselaw suggests that *McNeely* adequately handles claims of exigency arising from drugged driving. *See, e.g.*, *Byars*, 336 P.3d at 944–45; *Anderson*, 447 P.3d at 182; *Pearson*, 369 P.3d at 201.

Fifth, our cases should not whipsaw around like a wild caboose at the end of a federal caselaw train. *See Ochoa*, 792 N.W.2d at 266 (noting instances of "whipsaw" in caselaw where the court reversed precedents

based solely upon changes in United States Supreme Court doctrine). Here, the United States Supreme Court has not been remotely consistent. In *McNeely*, Justice Sotomayor's opinion was protective of Fourth Amendment rights, carefully sought to follow applicable precedent, and was consistent with the search and seizure principles outlined at the beginning of this opinion. In *Mitchell*, decided only a few years later, the Court embarked on a dramatically different path, explainable only by changes in the Court's membership. *Mitchell* runs against traditional principles of search and seizure law, including the need to carefully defend the protections of the Bill of Rights against state encroachment, the need to fashion only narrow exceptions to the warrant requirement, the notion that search and seizure protections are not defeated by mere administrative convenience, and the placement of the burden of demonstrating exceptions to the warrant requirement on the state. So, if the issue had been preserved, I would adhere to the approach in *McNeely* under article I, section 8 of the Iowa Constitution.

While there is a substantial body of scientific literature on the dissipation of alcohol, less is known about the dissipation of marijuana.[12] If the issue had been actually litigated in the district court, we would know more. We might also know how long it takes to get a warrant in an OWI

---

[12]Unlike the level of alcohol in the bloodstream, the level of marijuana metabolites in the bloodstream may not be a reliable indicator of intoxication. As noted by one resource,

> The nationally recognized level of impairment for drunken driving is .08 g/mL blood alcohol concentration. But there is no similar national standard for drugged driving. Drugs do not affect people consistently. Drugs such as marijuana can also stay in the system for weeks, thus appearing in roadside tests while no longer causing impairment.

*Drugged Driving: Marijuana-Impaired Driving*, Nat'l Conf. of State Legislatures (Nov. 9, 2020), https://www.ncsl.org/research/transportation/drugged-driving-overview.aspx [https://perma.cc/PG26-2R4S].

case. In this case, however, we are flying blind. So, on this appeal, I see no basis for developing some kind of new legal standard for marijuana, particularly one simply copied from *Mitchell*—a decision based solely on alcohol. Whether the State could have met its burden in this case under the traditional exigent-circumstances requirements, I do not know, but what I do know is that the State did not try to make the required showing. I would not remand for a second chance. But to the extent the State is entitled to a second chance, it should not be based upon a newly developed framework fashioned by this court on appeal on a completely inadequate record.[13]

---

[13]In this case, McGee also raises a claim that the application of Iowa's implied-consent law to him violates equal protection and that strict scrutiny should apply because the classifications affect his fundamental constitutional rights. The equal protection claim is viable only if the court finds Iowa Code sections 321J.6 and 321J.7 constitutionally applied in this case to validate the blood draw. The majority declines, however, to apply the terms of the implied-consent statute in this case. That's a good thing, as the statute is, as demonstrated by this opinion, unconstitutional under article I, section 8 of the Iowa Constitution. As a result, McGee's equal protection question is moot. That means the majority's discussion of the issue is dicta. Because I have found that the implied-consent provisions cannot constitutionally be applied against McGee, the equal protection claim is also moot under my approach. As a result, it is not necessary to address it on the merits.

There is also a reference in the majority opinion to *Baker v. City of Iowa City*, 867 N.W.2d 44 (Iowa 2015), in a footnote. In *Baker*, we held that where the basis for an assertion of a fundamental right was a constitutional claim and that claim failed, the classification would be judged on a rational basis test. *Id.* at 57.

The majority cites to *People v. Hyde*, 393 P.3d 962, 969 (Colo. 2017) (en banc), and *People v. Kates*, 428 N.E.2d 852, 855 (N.Y. 1981), two cases from other jurisdictions where an equal protection challenge to an implied-consent law was rejected because the court found no search and seizure violation.

Although I agree that *Baker* was properly decided, the principle in that case is extremely narrow. It depends on the proposition that the fundamental interest asserted as giving rise to strict scrutiny for equal protection purposes is entirely eliminated by the adverse ruling on the individuals' other constitutional claim. In other words, the claim supporting the assertion of a fundamental interest must be completely extinguished for *Baker* to apply. If the implied-consent law implicates a fundamental right and is invalid, any classifications might well be subject to strict scrutiny. But, as noted above, the claim is moot and needs not be addressed here.

**V. Conclusion.**

For the above reasons, I would reverse the judgment of the district court and remand the case with instructions that the motion to suppress should have been granted. I note that my approach does not prevent the state from searching for evidence through blood draws from an unconscious individual suspected of intoxicated driving. The state is never powerless to get such a blood sample, it only must get a search warrant or show the exigent circumstances that make obtaining such a warrant impracticable. As noted by Justice Gorsuch when serving as a judge on the Tenth Circuit, "The [Fourth] Amendment and the common law from which it was constructed leave ample room for law enforcement to do its job. A warrant will always do." *United States v. Carloss*, 818 F.3d 988, 1015 (10th Cir. 2016) (Gorsuch, J., dissenting).

But my approach does not have the analytical overkill of *Mitchell*; rather, it permits warrantless blood draws only in the narrow circumstances historically permitted by search and seizure doctrine. The only downside to my approach is that it might be less efficient. But the fact that obtaining a warrant requires some time and effort is not constitutionally significant. A blood draw involves the state thrusting a needle into your body and drawing out a substance that can provide many intimate details of health and life. It is a grave error to generally exempt such intrusions from the warrant requirement where truly exigent circumstances are not present.

---

With respect to the *Hyde* and *Kates* cases, these cases found no constitutional violation and, therefore, there could be no fundamental interest for equal protection purposes that would trigger strict scrutiny based on the unfounded constitutional claim.

These cases, and *Baker*, are limited to their narrow context. Nothing in the majority opinion or the footnote should affect the ability of a party to plead multiple, overlapping constitutional claims. The loss of one constitutional claim, of course, does not necessarily affect another.

**OXLEY, Justice (dissenting).**

In this case, on this record, I do not believe that the United States Supreme Court would extend *Mitchell v. Wisconsin*'s holding that the exigent circumstances involving suspected OWI from alcohol consumption apply equally to cases involving marijuana. 588 U.S. ___, 139 S. Ct. 2525 (2019). Absent an exigency, the State violated McGee's Fourth Amendment rights when it took the blood draw without obtaining actual consent or a warrant. I therefore respectfully dissent.

After describing the exigent circumstances exception to the Fourth Amendment's warrant requirement as being met only when "there is compelling need for official action and no time to secure a warrant," *id.* at ___, 139 S. Ct. at 2534 (quoting *Missouri v. McNeely*, 569 U.S. 141, 149, 133 S. Ct. 1552, 1559 (2013)), Justice Alito went to great lengths to describe the "compelling need" that justified a warrantless blood test taken from an unconscious driver suspected of drunk driving, *id.* at ___, 139 S. Ct. at 2535–37. Justice Alito summarized:

> The importance of the needs served by BAC testing is hard to overstate. The bottom line is that BAC tests are needed for enforcing laws that save lives. The specifics, in short, are these: Highway safety is critical; it is served by laws that criminalize driving *with a certain BAC level*; and *enforcing these legal BAC limits* requires efficient testing to obtain BAC evidence, which naturally dissipates. So BAC tests are crucial links in a chain on which vital interests hang. And when a breath test is unavailable to advance those aims, a blood test becomes essential.

*Id.* at ___, 139 S. Ct. at 2535 (emphasis added).

He then supported how compelling the need was with well-established and undisputed empirical data: alcohol-related accidents took ten to twenty thousand lives per year between 1982 and 2016; "federal and state lawmakers have long been convinced that *specified BAC limits*

make a big difference" in reducing the number of alcohol-related accidents; and, critically, "[e]nforcement of BAC limits . . . requires prompt testing because it is 'a biological certainty' that '[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour[;] . . . [e]vidence is literally disappearing by the minute.' " *Id.* at ___, 139 S. Ct. 2536 (second alteration and omission in original) (emphasis added) (quoting *McNeely*, 569 U.S. at 169, 133 S. Ct. at 1570–71 (Roberts, C.J., concurring in part and dissenting in part)). Even then, Justice Alito recognized continued adherence to *McNeely*, "the constant dissipation of BAC evidence *alone* does not create an exigency," and a warrant is still required unless there is "no time to secure a warrant." *Id.* at ___, 139 S. Ct. at 2537 (citing *McNeely*, 569 U.S. at 150–51, 133 S. Ct. at 1552).

The fact that THC may dissipate from the blood "quickly" is not both the beginning and the end analysis. If that is all that was needed to find a "compelling need," Justice Alito would not have described in such detail the reliability of the science surrounding blood alcohol concentration (BAC) levels, the significant impact a specific BAC level has for law enforcement's ability to enforce laws, and the effectiveness of laws setting particular BAC limits at reducing alcohol-related traffic accidents. *See id.* at ___, 139 S. Ct. at 2535–37.

Rather, the rationale for collecting the disappearing evidence is critical in determining whether the State has a compelling need that overrides Fourth Amendment protections. Evidence of a certain level of THC does not carry the same meaning as evidence of a BAC level. Whereas all fifty states and the District of Columbia outlaw driving with a BAC above .08, there is no magic number for THC. There is no magic number because marijuana is a much more complicated drug than alcohol, not only with respect to how and when it dissipates from the blood, but also

with respect to the extent to which it impairs a driver's abilities. *See* Andrea Roth, *The Uneasy Case for Marijuana as Chemical Impairment Under a Science-Based Jurisprudence of Dangerousness*, 103 Calif. L. Rev. 841, 897 (2015) [hereinafter Roth] ("Applying this DUI alcohol framework to the marijuana context, it is clear that the THC blood limits chosen by states have no scientific basis if their purpose is to target dangerous driving. On the contrary, the science that does exist strongly suggests that these levels do not correspond with dangerous driving impairment. This is not to say that driving while stoned is safe; it is only to say that, as of this writing, THC blood levels cannot legitimately be used to define chemical impairment under a science based jurisprudence of dangerousness.").

Justice Alito's description of the importance of BAC levels makes clear that the sought-after evidence must be practically necessary for the administration of law enforcement's duties, in addition to being time sensitive. The uniform and scientifically verified .08 BAC level has made accurate BAC determinations a necessary mechanism for enforcing alcohol-related offenses. It is inappropriate to recast that logic in the context of marijuana, where there is no scientific consensus regarding marijuana impairment, at what levels impairment arises, or what certain evidence says about current impairment. It would be wrong to say that a blood test for THC is foundational to highway safety the same way BAC testing is.

At least partially in recognition of the difficulties with measuring and evaluating impairment caused by marijuana use, Iowa law criminalizes operating a motor vehicle "while any amount of a controlled substance is present . . . in the person's blood or urine." Iowa Code § 321J.2(1)(*c*) (2018). The presence of carboxy-THC, the nonimpairing metabolite of

marijuana, satisfies the "any amount of a controlled substance" prong of operating while intoxicated. *See State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017) ("The Iowa legislature chose to cast a wider net, criminalizing driving with any amount of prohibited substances in one's body, including the nonimpairing metabolite at issue commonly found in urine after marijuana use."); *see also* Iowa Code § 321J.1(4) (defining "controlled substance" to include "any metabolite or derivative of the drug, substance, or compound" listed in section 124.204).[14] "The strict standard relates in part to the current hurdles in testing drug impairment. For example, [in 2019], there [wa]s no device for a peace officer to identify marijuana-impaired driving or even an accepted standard to identify such an impairment." *State v. Newton*, 929 N.W.2d 250, 258 n.2 (Iowa 2019) (citation omitted). The legislature has, effectively, taken care of any exigency caused by dissipation of active THC by allowing officers to charge, and a court to convict, an individual for OWI based only on the presence of carboxy-THC.

McGee was charged and convicted with operating a motor vehicle under the "any amount" prong of OWI. *See* Iowa Code § 321J.2(1)(*c*). The majority does not dispute that there are no exigent circumstances related to testing for carboxy-THC, the only substance needed to support a conviction under section 321J.2(1)(*c*), since that metabolite is admittedly

---

[14]In *State v. Childs*, we justified "[t]he harshness of Iowa's flat ban [a]s ameliorated by the fact that the motorist would be asked to submit to chemical testing only after the officer performed a lawful traffic stop and had reasonable grounds to believe the driver was impaired." 898 N.W.2d at 185. And just two years ago we rejected a due process challenge to the "any amount" statute as applied to metabolites of a controlled substance that remains in the blood for days based on the "broader 'statutory scheme' " under which "a properly invoked blood or urine test is part and parcel to a criminal prosecution under Iowa Code section 321J.2(1)(*c*)." *State v. Newton*, 929 N.W.2d 250, 256–57 (Iowa 2019) (quoting *State v. Robinson*, 618 N.W.2d 306, 315 (Iowa 2000) (en banc)). Query what the majority's opinion does to that broader statutory scheme.

detectible for at least "some time." A conviction under subsection (1)(*c*) subjects the defendant to the same punishment as a conviction for operating under the influence under subsection (1)(*a*). *See* Iowa Code § 321J.2(2) (imposing same penalties for any violation of subsection 1). With respect to enforcing Iowa's OWI laws, law enforcement's compelling need for evidence is satisfied the same whether the blood is drawn quickly in an attempt to capture active THC or after a bit of a delay when carboxy-THC may be the only thing still present. Despite the clear lack of any exigency in capturing carboxy-THC in a suspect's blood, and despite the majority's own recognition that active THC can stay in the body for hours or even days and marijuana's unpredictable properties make inferences about its psychoactive effect nearly impossible, the majority nonetheless leaps to the conclusion that the presence of active THC in the blood "makes the case for impairment stronger than it otherwise would be." The majority then uses this unsupported conclusion to move from a clear lack of exigency in this case involving an any-amount OWI (which requires no evidence of impairment, so there is no need to strengthen "the case for impairment") to the broad generalization that because active THC dissipates quickly, evidence of marijuana use always creates an exigency. The majority justifies its broad holding by proclaiming that law enforcement should not have to "settle" for lesser evidence when stronger evidence is available. Except they should when it comes to infringing on a citizen's Fourth Amendment protections without a warrant—unless they can prove a compelling need to support the exigency exception to the warrant requirement. *See Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2535.

It may be that "there are legitimate reasons why law enforcement would want more," including, at least theoretically, avoiding jury nullification or the need to support the causation element of a charge

under Iowa Code section 707.6A(4), as offered by the majority. But "compelling need," not hypothetical "legitimate reasons," is the standard for establishing exigent circumstances. *See Mitchell*, 588 U.S. at \_\_\_, 139 S. Ct. at 2535 ("BAC tests are *crucial links* in a chain on which vital interests hang. And when a breath test is unavailable to advance those aims, a blood test becomes essential." (emphasis added)). Further, those justifications must come from the State in support of its reliance on the exigent-circumstances exception to the warrant requirement, not as an after-the-fact rationalization created by this court. *See State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011) ("The State has the burden of proving 'by a preponderance of the evidence that a warrantless search falls within one of these exceptions.' " (quoting *State v. Naujoks*, 637 N.W.2d 101, 107–08 (Iowa 2001))).

Even then, the jury nullification rationale presupposes the jury would ignore a judge's instruction that the presence of a marijuana metabolite satisfies our laws, a presumption we repeatedly decry. *See, e.g., State v. Gomez Garcia*, 904 N.W.2d 172, 183 (Iowa 2017) ("We presume jurors follow the court's . . . instructions."). This is hardly a compelling state interest that can be equated with a scientifically proven BAC level that saves thousands of lives to support overriding a driver's Fourth Amendment rights.

I do agree with the majority that the need for evidence of active THC to support a section 707.6A(4) charge, which requires proof of a causal connection between impaired driving and serious injuries, could potentially support the exigent circumstances needed to dispense with a warrant—if it could be shown that active THC levels correlated to impaired driving. But there is no evidence in this record to support that proposition. And it is not so well established that we should be doing our own research

and relying on student notes and commentators' views to find post hoc support for the State's compelling interest needed to establish an exigency. *Cf. State v. McCall*, 839 S.E.2d 91, 95 n.2 (S.C. 2020) (discussing toxicologist's testimony regarding THC metabolization); *City of Seattle v. Pearson*, 369 P.3d 194, 201 (Wash. Ct. App. 2016) (same). Indeed, Professor Roth explains that "even if . . . scientists could straightforwardly infer proximity of use from THC blood levels, marijuana's unpredictable properties render nearly impossible any inference about the likely psychoactive effect on the brain of a specific THC blood level." Roth, 103 Calif. L. Rev. at 887.

Another more fundamental problem with this justification is that McGee was not charged with violating section 707.6A(4). Recognizing this deficiency, the majority combed the record to find evidence of the victim's injuries, concluding thirteen stitches, two weeks of missed school, and a fear of riding in a car support its conclusion that "situations like this can be fluid," so an exigency exists in this case. Under the majority's rationale, an exigency exists in any case involving any type of injury.

But the State did not offer the potential for a section 707.6A(4) charge as a justification at the suppression hearing. To the contrary, Officer Fricke expressly (and repeatedly) testified at the suppression hearing that he did not even attempt to obtain a warrant because he understood he could not get one in this case because there were no serious injuries. Thus, as a factual matter, that need cannot support an exigency in this particular case. *See Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2537–39 (plurality rejecting Justice Thomas's lone view for a per se exception to the warrant requirement for drunk-driving cases and maintaining the case-by-case analysis recently espoused in *McNeely*).

On the facts presented at the suppression hearing, the State failed to establish the exigent circumstances necessary to avoid procuring a warrant, and I would hold that McGee's Fourth Amendment rights were violated. In fairness, *Mitchell* came down after the suppression hearing, where the State relied on the implied-consent statute and offered no evidence of exigency even in light of McGee's argument that an exigency was required to support the warrantless blood draw. At a minimum, the State should be tasked with presenting facts to the district court to support the compelling need to obtain evidence of active THC, as opposed to evidence of carboxy-THC, when the officers chose to forego a warrant. As it stands, the majority has found a compelling need as a matter of law, and the State gets a pass on that required showing.

I do not believe the Supreme Court would extend *Mitchell*'s categorical rule for driving under the influence of alcohol to driving with any amount of marijuana in the driver's blood or urine, and I therefore respectfully dissent.

Appel, J., joins this dissent.